# INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL–CIO, ET AL. *v.* ALLIED INTERNATIONAL, INC.

No. 80–1663. Argued January 18, 1982—Decided April 20, 1982

POWELL, J., delivered the opinion for a unanimous court.

*Ernest L. Mathews, Jr.*, argued the cause for petitioners. With him on the briefs were *Thomas W. Gleason* and *Charles R. Goldburg*.

*Duane R. Batista* argued the cause for respondent. With him on the brief were *Danielle E. DeBenedictis, David M. Saltiel,* and *Steven R. Berger*.

*Deputy Solicitor General Wallace* argued the cause for the United States as *amicus curiae* urging affirmance. With

him on the brief were *Solicitor General Lee, Harriet S. Shapiro, Norton J. Come, Joseph E. Mayer,* and *James Holcomb.*\*

JUSTICE POWELL delivered the opinion of the Court.

The question for our decision is whether a refusal by an American longshoremen's union to unload cargoes shipped from the Soviet Union is an illegal secondary boycott under § 8(b)(4) of the National Labor Relations Act (NLRA), 61 Stat. 141, as amended, 29 U. S. C. § 158(b)(4).

## I

On January 9, 1980, Thomas Gleason, president of the International Longshoremen's Association (ILA), ordered ILA members to stop handling cargoes arriving from or destined for the Soviet Union. Gleason took this action to protest the Russian invasion of Afghanistan.[1]  In obedience to the order,

---

\**J. Albert Woll* and *Laurence Gold* filed a brief for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *Kenneth C. McGuiness, Robert E. Williams, Allen A. Lauterbach,* and *C. David Mayfield* for the American Farm Bureau Federation; and by *Thomas P. Gies* for Occidental Chemical Co.

[1] The directive provided:

"In response to overwhelming demands by the rank and file members of the Union, the leadership of ILA today ordered immediate suspension in handling all Russian ships and all Russian cargoes in ports from Maine to Texas and Puerto Rico where ILA workers are employed.

"This order is effective across the board on all vessels and all cargoes. Grain and other foods as well as high valued general freight.  However, any Russian ship now in process of loading or discharging at a waterfront will be worked until completion.

"The reason for this action should be apparent in light of international events that have affected relations between the U. S. and the Soviet Union.

longshoremen up and down the east and gulf coasts refused
to service ships carrying Russian cargoes.[2]

Respondent Allied International, Inc. (Allied), is an Amer-
ican company that imports Russian wood products for re-
sale in the United States. Allied contracts with Waterman
Steamship Lines (Waterman), an American corporation op-
erating ships of United States registry, for shipment of the
wood from Leningrad to ports on the east and gulf coasts of
the United States. Waterman, in turn, employs the steve-
doring company of John T. Clark & Son of Boston, Inc.
(Clark), to unload its ships docking in Boston. Under the
terms of the collective-bargaining agreement between ILA
Local 799 and the Boston Shipping Association, of which
Clark is a member, Clark obtains its longshoring employees
through the union hiring hall.[3]

As a result of the boycott, Allied's shipments were dis-
rupted completely. Ultimately, Allied was forced to re-
negotiate its Russian contracts, substantially reducing its
purchases and jeopardizing its ability to supply its own

"However, the decision by the Union leadership was made necessary by
the demands of the workers.

"It is their will to refuse to work Russian vessels and Russian cargoes un-
der present conditions in the world.

"People are upset and they refuse to continue the business as usual policy
as long as the Russians insist on being international bully boys. It is a
decision in which the Union leadership concurs." App. 10a–11a.

[2] Several lawsuits have resulted from the ILA's Russian boycott. See
*Baldovin* v. *International Longshoremen's Assn.*, 626 F. 2d 445 (CA5
1980); *New Orleans S.S. Assn.* v. *General Longshore Workers, ILA*, 626 F.
2d 455 (CA5 1980), cert. granted *sub nom. Jacksonville Bulk Terminals,
Inc.* v. *Longshoremen*, 450 U. S. 1029 (1981).

[3] Article 40 of the collective-bargaining agreement contains a broad no-
strike, no-lockout clause:

"The Employers agree that there shall be no lockout or work stoppage by
the Employers, and the Union agrees that there shall be no strike or work
stoppage by the employees. The right of the employees not to cross a
bona-fide picket line is recognized by the Employers." App. 29a.

customers. App. 24a–28a. On March 31, 1980, after union officals informed Allied that ILA members would continue to refuse to unload any Russian cargo, Allied brought this action in the United States District Court for the District of Massachusetts. Claiming that the boycott violated the prohibition against secondary boycotts in § 8(b)(4) of the NLRA, 29 U. S. C. § 158(b)(4),[4] Allied sued for damages under § 303 of the Labor Management Relations Act, 1947 (LMRA), 61 Stat. 158, as amended, 29 U. S. C. § 187,[5] which creates a private damages remedy for the victims of secondary boycotts.[6]

---

[4] Section 8(b) provides in relevant part:

"It shall be an unfair labor practice for a labor organization or its agents—

.            .            .            .            .

(4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

.            .            .            .            .

"(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person . . . ."

[5] Section 303 of the LMRA, 61 Stat. 158, as amended and as set forth in 29 U. S. C. § 187, provides in pertinent part:

"(a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b)(4) of this title.

"(b) Whoever shall be injured in his business or property by reason [of] any violation of subsection (a) of this section may sue therefor in any district court of the United States . . . and shall recover the damages by him sustained and the cost of the suit."

[6] Allied also alleged that the ILA boycott violated the Sherman Act, 15 U. S. C. § 1, and amounted to a tortious interference with Allied's business relationships in violation of admiralty law. The Court of Appeals affirmed the District Court's dismissal of these claims, and they are not before us now. See 640 F. 2d 1368, 1379–1382 (CA1 1981).

At about the same time, Allied filed an unfair labor practice charge with the National Labor Relations Board under § 10(b) of the NLRA, 29 U. S. C. § 160(b).[7]

Finding that Allied had not alleged a violation of § 8(b)(4)(B), the District Court dismissed Allied's complaint. 492 F. Supp. 334 (1980). The court characterized the ILA boycott as a purely political, primary boycott of Russian goods.[8] So described, the boycott was not within the scope of § 8(b)(4).[9]

The Court of Appeals for the First Circuit reversed the dismissal of Allied's complaint and remanded for further proceedings. 640 F. 2d 1368 (1981). As an initial matter, and in agreement with the District Court, the court found that the effects of the ILA boycott were "in commerce" within the meaning of the NLRA as interpreted by a long line of deci-

---

[7] On March 26, 1980, the Regional Director issued an unfair labor practice complaint against the ILA and filed a request for a preliminary injunction in Federal District Court. Finding that the ILA boycott was a political dispute outside the scope of § 8(b)(4)(B), the District Court denied the request for a preliminary injunction. *Walsh* v. *International Longshoremen's Assn.*, 488 F. Supp. 524 (Mass. 1980). The Court of Appeals affirmed on a different theory. *Walsh* v. *International Longshoremen's Assn.*, 630 F. 2d 864 (CA1 1980). It found that the denial of the Board's earlier request for injunctive relief against the boycott in *Baldovin* v. *International Longshoremen's Assn.*, Civ. No. 80–259 (SD Tex. Feb. 15, 1980), aff'd, 626 F. 2d 445 (CA5 1980), had preclusive effect.

[8] Allied's suit for damages was consolidated with *Walsh* v. *International Longshoremen's Assn.*, *supra*. In dismissing Allied's claim for damages, the District Court relied upon its characterization of the ILA boycott in *Walsh* as the law of the case. 492 F. Supp., at 336.

[9] " 'The ILA had not induced a strike against Allied, Waterman, or Clark . . . ; nor does it seek to pressure those employers not to deal with one another. No picket lines have been established and no other employees have been prevented from work. . . . This is a primary boycott of Russian goods, with incidental effects upon those employers who deal in such goods. As such, the actions of the respondents may not be prohibited by §§ 8(b)(4)(i), (ii)(b).' " *Ibid.*, quoting *Walsh* v. *International Longshoremen's Assn.*, 488 F. Supp., at 530–531.

sions of this Court.[10]   The court held further that the ILA boycott, as described in Allied's averments, was within § 8(b)(4)'s prohibition of secondary boycotts, despite its political purpose, and that resort to such behavior was not protected activity under the First Amendment.[11]

We granted certiorari to determine the coverage of the secondary boycott provisions of the NLRA in this setting. 454 U. S. 814 (1981). We affirm.

## II

Our starting point in a case of this kind must be the language of the statute. By its exact terms the secondary boycott provisions of § 8(b)(4)(B) of the NLRA would appear to be aimed precisely at the sort of activity alleged in this case. Section 8(b)(4)(B) governs activities designed to influence individuals employed by "any person engaged in commerce or in an industry affecting commerce."[12]   Certainly Allied, Wa-

---

[10] In so holding, the court differed with the conclusion reached by the Court of Appeals for the Fifth Circuit in *Baldovin* v. *International Longshoremen's Assn., supra.*

[11] The NLRB reached the same conclusion in its decision upon the Regional Director's complaint against the ILA. See n. 7, *supra.* The Board held that the ILA's refusal to unload Allied's shipments was "in commerce" and amounted to a secondary boycott in violation of §§ 8(b)(4)(i) and (ii)(B). The Board issued a cease-and-desist order to Local 799 requiring it to unload Allied's shipments. *International Longshoremen's Assn., AFL–CIO (Allied International, Inc.),* 257 N. L. R. B. 1075 (1981). Petitions to review the Board's decision and order were filed by both the ILA and Allied and are now pending before the United States Court of Appeals for the District of Columbia Circuit.

[12] The terms "commerce" and "affecting commerce" are defined in §§ 2(6) and (7), 29 U. S. C. §§ 152(6) and (7), as amended by the LMRA, as follows:

"(6) The term 'commerce' means trade, traffic, commerce, transportation, or communication among the several States, or between the District of Columbia or any Territory of the United States and any State or other Territory, or between any foreign country and any State, Territory, or the District of Columbia, or within the District of Columbia or any Territory, or

terman, and Clark were engaged "in commerce," and Allied alleges that the effect of the ILA action was to obstruct commerce up and down the east and gulf coasts.[13]   Just as plainly, it would appear that the ILA boycott fell within § 8(b)(4)(B)'s prohibition of secondary boycotts.   Allied alleges that by inducing members of the union to refuse to handle Russian cargoes, the ILA boycott was designed to force Allied, Waterman, and Clark "to cease doing business" with one another and "to cease using, selling, handling, transporting, or otherwise dealing in" Russian products.

Notwithstanding the language of the statute, petitioners argue that their conduct was not "in commerce" as our decisions have interpreted that term.   They argue as well that even if the ILA activity were within the jurisdictional scope of § 8(b)(4), the boycott was not the sort of secondary boycott Congress intended to proscribe.   We address these arguments in turn.

## A

In a line of cases beginning with *Benz* v. *Compania Naviera Hidalgo*, 353 U. S. 138 (1957),[14] the Court has held

---

between points in the same State but through any other State or any Territory or the District of Columbia or any foreign country.

"(7) The term 'affecting commerce' means in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce."

[13] "At first blush, it might appear too plain for discussion that the ILA's refusal to unload Allied's goods affects both commerce and a person engaged in commerce.   Allied, Waterman and Clark are American companies and the ILA is an American union.   All engage regularly in business affecting the transportation of goods among the several states.   Indeed, the instant dispute arose when the ILA's actions allegedly impeded Allied's ability to move its wood products from Boston to other ports along the East coast, and Allied contends that the ILA continues to frustrate its ability to transport its goods into this country."   640 F. 2d, at 1371.

[14] See *McCulloch* v. *Sociedad Nacional*, 372 U. S. 10 (1963); *Incres S.S. Co.* v. *Maritime Workers*, 372 U. S. 24 (1963); *Longshoremen* v. *Ariadne*

that the "maritime operations of foreign-flag ships employing alien seamen are not in 'commerce'" as this term is used in the NLRA.[15]   Thus, in *Benz* the Court held that picketing by an American union in support of striking foreign crew-members of a foreign-flag vessel was not governed by the Act.   Relying upon the legislative history of the NLRA and the longstanding principles of comity in the treatment of foreign vessels, the Court held that the labor laws were not designed "to resolve labor disputes between nationals of other countries operating ships under foreign laws." *Id.*, at 143.[16]

More recently in *Windward Shipping, Ltd.* v. *American Radio Assn.*, 415 U. S. 104 (1974), and *American Radio Assn.* v. *Mobile S.S. Assn.*, 419 U. S. 215 (1974), the Court again identified the limits to the jurisdictional reach of the labor laws in the context of foreign vessels.   In *Windward*, American maritime unions picketed foreign-flag vessels to call attention to the lower wages paid to foreign seamen and to the adverse effect of these lower wages on American seamen.   Finding that the picketing was designed to raise the operating costs of foreign vessels and that it had "more than a negligible impact on the 'maritime operations' of these for-

---

*Co.*, 397 U. S. 195 (1970); *Windward Shipping, Ltd.* v. *American Radio Assn.*, 415 U. S. 104 (1974); *American Radio Assn.* v. *Mobile S.S. Assn.*, 419 U. S. 215 (1974).

[15] *Incres S.S. Co.* v. *Maritime Workers, supra*, at 27.   The Court noted in a later case that the "term 'in commerce,' as used in the LMRA, is obviously not self-defining." *Windward Shipping, Ltd.* v. *American Radio Assn., supra*, at 112.

[16] The Court adhered to a similar approach in the companion cases of *McCulloch* v. *Sociedad Nacional, supra*, and *Incres S.S. Co.* v. *Maritime Workers, supra*.   In *McCulloch* the Court held that the National Labor Relations Board did not have jurisdiction to determine the union representation of a foreign crew aboard a foreign vessel.   In *Incres* the Court held that organizational picketing by an American union seeking to organize foreign seamen on a foreign-flag vessel also was outside the Board's jurisdiction.

eign ships," 415 U. S., at 114, the Court held that the union's activity was not "in commerce" under the labor laws. *Id.*, at 115.

Facing the identical activity by maritime unions in *Mobile*, the Court reached the same conclusion. The complainants in *Mobile* were not foreign shipowners, as in *Windward*, but parties feeling the secondary effects of the union's protest— American stevedoring companies and an American shipper. The Court held that this change in complaining parties did not alter the jurisdictional reach of the Act. The *Benz* line of cases did not permit "a bifurcated view of the effects of a single group of pickets at a single site." *Mobile, supra*, at 222. The refusal of American stevedores to cross the picket lines "was a crucial part of the mechanism by which the maritime operations of the foreign ships were to be affected." 419 U. S., at 224.

Applying the principles developed in these cases to the circumstances here, we find that the ILA's activity was "in commerce" and within the scope of the NLRA. Unlike the situation in every case from *Benz* through *Mobile*, the ILA's refusal to unload Allied's shipments in no way affected the maritime operations of foreign ships. The boycott here did not aim at altering the terms of employment of foreign crews on foreign-flag vessels. It did not seek to extend the bill of rights developed for American workers and American employers to foreign seamen and foreign shipowners. The longstanding tradition of restraint in applying the laws of this country to ships of a foreign country—a tradition that lies at the heart of *Benz* and every subsequent decision—therefore is irrelevant to this case.[17] As the Court of Appeals ex-

---

[17] Jurisdiction in the NLRA over the ILA boycott is consistent with two further considerations. The ILA boycott is a national boycott affecting ports throughout the United States. Were the effects of this boycott not "in commerce," complaining parties such as Allied could seek relief in state courts. The possibility of conflicting decisions by a multitude of state

plained, this drama was "played out by an all-American cast." 640 F. 2d, at 1374. "[A]n American union has ordered its members not to work for an American stevedore which had contracted to service an American ship carrying goods of an American importer." *Id.*, at 1372. In these circumstances, the clear language of the statute needs no further explication.

## B

The secondary boycott provisions in § 8(b)(4)(B) prohibit a union from inducing employees to refuse to handle goods with the object of forcing any person to cease doing business with any other person.[18] By its terms the statutory prohibition applies to the undisputed facts of this case. The ILA has no dispute with Allied, Waterman, or Clark. It does not seek any labor objective from these employers.[19] Its sole com-

---

courts frustrates one of the basic purposes of the NLRA—to establish a uniform national labor policy. Moreover, the ILA boycott commenced just a few days after President Carter ordered a boycott on exports to the Soviet Union. It differed in significant respects from that embargo. See 16 Weekly Comp. of Pres. Doc. 42 (1980). On February 16, 1980, the Legal Adviser of the State Department informed the Attorney General "that the Department of State believes that the action of the ILA conflicts with significant U. S. foreign policy interests." Supplementary Memorandum in Support of Motion for Preliminary Injunction, Attachment A. Federal jurisdiction is supported by the national interests affected by the ILA boycott. See *International Longshoremen's Assn., AFL–CIO (Allied International, Inc.)*, 257 N. L. R. B., at 1077 ("this case presents the novel situation of a labor union establishing a national boycott contravening a Federal policy").

[18] In *Carpenters* v. *NLRB*, 357 U. S. 93, 98 (1958), the Court described the elements of a § 8(b)(4) violation as threefold: "Employees must be induced; they must be induced to engage in a strike or concerted refusal; an object must be to force or require their employer or another person to cease doing business with a third person."

[19] "We think it plain that the ILA was not engaged in primary activity and that the boycott against Allied's goods was 'calculated to satisfy union objectives elsewhere.' The ILA concedes it has no dispute with Clark, Waterman or Allied, and there is no suggestion that it seeks to affect the labor relations of any of these employers. It is also plain that

plaint is with the foreign and military policy of the Soviet Union. As understandable and even commendable as the ILA's ultimate objectives may be, the certain effect of its action is to impose a heavy burden on neutral employers. And it is just such a burden, as well as widening of industrial strife, that the secondary boycott provisions were designed to prevent.[20] As the NLRB explained in ruling upon the Regional Director's complaint against the ILA:

"It is difficult to imagine a situation that falls more squarely within the scope of Section 8(b)(4) than the one before us today. Here, the Union's sole dispute is with the USSR over its invasion of Afghanistan. Allied, Waterman, and Clark have nothing to do with this dispute. Yet the Union's actions in furtherance of its disagreement with Soviet foreign policy have brought direct economic pressure on all three parties and have resulted in a substantial cessation of business. Thus, the conduct al-

---

these 'unoffending employers' have been embroiled in a 'controversy not their own' as a result of union action which 'reasonably could be expected' to 'threaten a neutral party with ruin or substantial loss.' " 640 F. 2d, at 1377.

[20] Justice Frankfurter explained that Congress "aimed to restrict the area of industrial conflict insofar as this could be achieved by prohibiting the most obvious, widespread, and, as Congress evidently judged, dangerous practice of unions to widen that conflict: the coercion of neutral employers." *Carpenters* v. *NLRB, supra,* at 100.

The Court frequently has described the purpose of the secondary boycott provisions as twofold: the preservation of the right of labor organizations to place pressure on employers with whom there is a primary dispute as well as the protection of neutral employers and employees from the labor disputes of others. See, *e. g., NLRB* v. *Denver Building Trades Council,* 341 U. S. 675, 692 (1951) (noting the "dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own"). In the circumstances of this case, however, only the second of these objectives has any relevance. The ILA had no dispute with Allied, Waterman, or Clark. See n. 19, *supra.*

leged in this case is precisely the type of conduct Congress intended the National Labor Relations Act to regulate." *International Longshoremen's Assn., AFL–CIO (Allied International, Inc.)*, 257 N. L. R. B. 1075, 1078–1079 (1981) (footnote omitted).

Nor can it be argued that the ILA's action was outside of the prohibition on secondary boycotts because its object was not to halt business between Allied, Clark, and Waterman with respect to Russian goods, but simply to free ILA members from the morally repugnant duty of handling Russian goods. Such an argument misses the point. Undoubtedly many secondary boycotts have the object of freeing employees from handling goods from an objectionable source. Nonetheless, when a purely secondary boycott "reasonably can be expected to threaten neutral parties with ruin or substantial loss," *NLRB* v. *Retail Store Employees*, 447 U. S. 607, 614 (1980), the pressure on secondary parties must be viewed as at least one of the objects of the boycott or the statutory prohibition would be rendered meaningless.[21] The union must take responsibility for the "foreseeable consequences" of its conduct. *Id.*, at 614, n. 9; see *NLRB* v. *Operating Engineers*, 400 U. S. 297, 304–305 (1971). Here the union was fully aware of the losses it was inflicting upon Allied. It is undisputed that Allied officials endeavored to persuade ILA leaders to allow it to fulfill its Russian contracts. On the basis of the record before it, the Court of Appeals correctly concluded that Allied had alleged a violation of § 8(b)(4).[22]

Neither is it a defense to the application of § 8(b)(4) that the reason for the ILA boycott was not a labor dispute with a primary employer but a political dispute with a foreign nation.

---

[21] "It is not necessary to find that the *sole* object" of the boycott was the disruption of business of neutral parties. *NLRB* v. *Denver Building Trades Council, supra*, at 689.

[22] As both the Court of Appeals and the NLRB noted, such a result is particularly appropriate in this case since it is not even arguable that Allied was feeling the secondary effects of a *primary* dispute protected by the Act. See 640 F. 2d, at 1376, n. 6; 257 N. L. R. B., at 1082. We are not faced in this case with the often difficult task of characterizing union

Section 8(b)(4) contains no such limitation. In the plainest of language it prohibits "forcing . . . any person to cease . . . handling . . . the products of any other producer . . . or to cease doing business with any other person." The legislative history does not indicate that political disputes should be excluded from the scope of § 8(b)(4). The prohibition was drafted broadly to protect neutral parties, "the helpless victims of quarrels that do not concern them at all." H. R. Rep. No. 245, 80th Cong., 1st Sess., 23 (1947). Despite criticism from President Truman as well as from some legislators that the secondary boycott provision was too sweeping, the Congress refused to narrow its scope. Recognizing that "[i]llegal boycotts take many forms," *id.*, at 24, Congress intended its prohibition to reach broadly.[23]

We would create a large and undefinable exception to the statute if we accepted the argument that "political" boycotts are exempt from the secondary boycott provision. The distinction between labor and political objectives would be difficult to draw in many cases. In the absence of any limiting language in the statute or legislative history, we find no reason to conclude that Congress intended such a potentially expansive exception to a statutory provision purposefully drafted in broadest terms.

We agree with the Court of Appeals that it is "more rather than less objectionable that a national labor union has chosen to marshal against neutral parties the considerable powers derived by its locals and itself under the federal labor laws in

---

activity as either protected primary or prohibited secondary activity. See *Electrical Workers* v. *NLRB*, 366 U. S. 667, 673–674 (1961).

[23] Responding to the claim that there were "good secondary boycotts and bad secondary boycotts," Senator Taft stated: "Our committee heard evidence for weeks and never succeeded in having anyone tell us any difference between different kinds of secondary boycotts. So we have so broadened the provision dealing with secondary boycotts as to make them an unfair labor practice." 93 Cong. Rec. 4198 (1947).

In *NLRB* v. *Fruit Packers*, 377 U. S. 58, 63 (1964), the Court concluded that Congress did not intend to bar "*all* peaceful *consumer picketing* at secondary sites" (emphasis added).

aid of a random political objective far removed from what has traditionally been thought to be the realm of legitimate union activity." 640 F. 2d, at 1378. In light of the statutory language and purpose, we decline to create a far-reaching exemption from the statutory provision for "political" secondary boycotts.[24]

## III

Application of § 8(b)(4) to the ILA's activity in this case will not infringe upon the First Amendment rights of the ILA and its members. We have consistently rejected the claim that secondary picketing by labor unions in violation of § 8(b)(4) is protected activity under the First Amendment. See, *e. g.*, *NLRB* v. *Retail Store Employees, supra,* at 616; *American Radio Assn.* v. *Mobile S.S. Assn.*, 419 U. S., at 229–231. Cf. *NLRB* v. *Fruit Packers,* 377 U. S. 58, 63 (1964).[25] It would seem even clearer that conduct designed not to communicate but to coerce merits still less consideration under the First Amendment.[26] The labor laws reflect a careful balancing of interests. See *NLRB* v. *Retail Store Employees,*

---

[24] Cf. *Plumbers & Pipefitters* v. *Plumbers & Pipefitters,* 452 U. S. 615 (1981) (rejecting view that § 301(a) of the LMRA applies only to disputes between local and parent unions concerning labor-management relations).

[25] In *Electrical Workers* v. *NLRB,* 341 U. S. 694, 705 (1951), the Court held: "The prohibition of inducement or encouragement of secondary pressure by § 8(b)(4)(A) carries no unconstitutional abridgement of free speech. The inducement or encouragement in the instant case took the form of picketing . . . . [W]e recently have recognized the constitutional right of states to proscribe picketing in furtherance of comparably unlawful objectives. There is no reason why Congress may not do likewise" (footnote omitted).

[26] Cf. *NLRB* v. *Retail Store Employees,* 447 U. S. 607, 619 (1980) ("The statutory ban in this case affects only that aspect of the union's efforts to communicate its views that calls for an automatic response to a signal, rather than a reasoned response to an idea") (STEVENS, J., concurring); *United States* v. *O'Brien,* 391 U. S. 367, 376 (1968) ("This Court has held that when 'speech' and 'nonspeech' elements are combined in the same

447 U. S., at 617 (BLACKMUN, J., concurring). There are many ways in which a union and its individual members may express their opposition to Russian foreign policy without infringing upon the rights of others.

The judgment of the Court of Appeals is

*Affirmed.*

---

course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms").