Francis E. DOWD, Regional Director of Region 12 of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL–CIO, Respondent.

No. 91–742–Civ–T–21A.

United States District Court, M.D. Florida, Tampa Division.

Sept. 18, 1991.

---

Margaret J. Diaz, for petitioner.

Herzl S. Eisenstadt, for respondent.

## TEMPORARY INJUNCTION

NIMMONS, District Judge.

THIS CAUSE came on for consideration upon the verified petition of Francis E. Dowd, Regional Director of Region 12 of the National Labor Relations Board (the "Board"), for and on behalf of the Board, for a temporary injunction pursuant to Section 10(*l*) of the National Labor Relations Act, as amended, pending the final adjudication of the matters involved before the Board, and upon the issuance of an order to show cause why injunctive relief should not be granted.

Upon consideration of the report and recommendation of the Magistrate Judge and upon this Court's independent examination of the file, the Magistrate Judge's report and recommendation is hereby adopted and made a part hereof, and it is hereby

ORDERED that:

The Board's Petition for Temporary Injunction Pursuant to Section 10(*l*) of the National Labor Relations Act, as Amended, is GRANTED as follows:

(a) Pending the final adjudication of the matters involved before the National Labor Relations Board, Respondent International

Longshoremen's Association AFL–CIO, its officers, representatives, agents, servants, employees, attorneys, and all members and persons acting in concert or participation with them are hereby enjoined and restrained from:

(1) In any manner or by any means, including requests or appeals, or any like or related conduct, or by permitting such to remain in existence or effect, threatening, coercing or restraining shipping agents, shipping companies, citrus exporters, citrus importers, the Canaveral Port Authority, and other persons engaged in commerce or in an industry affecting commerce, who are neutral to the dispute between Respondent and Coastal and between Respondent and Canaveral and other non-union stevedoring companies operating at Port Canaveral, Florida, where an object thereof is to force or require them to cease doing business with Coastal, and with Canaveral, and other non-union stevedoring companies operating at Port Canaveral, Florida, and with each other, and to otherwise alter their business relationships related to the shipment of citrus fruit from Ft. Pierce and Port Canaveral, Florida to Japan;

(2) Acting upon, or giving any effect to, its letter of October 4, 1990, signed by John Bowers, to the National Council of Dockworker's Unions of Japan.

(b) Pending the final adjudication of the matters involved before the National Labor Relations Board, Respondent International Longshoremen's Association shall, within seven (7) days of the date of this Order, affirmatively rescind, repudiate, and disavow, in writing, its letter of October 4, 1990, signed by John Bowers, to the National Council of Dockworker's Unions of Japan. Respondent International Longshoremen's Association shall also, within fifteen (15) days of the date of this Order, file with the Court evidence that the National Council of Dockworker's Unions of Japan has received notice of such disavowal.

(c) In addition to the mailing of copies, the Clerk shall immediately telephonically communicate the contents of this injunction to counsel of record.

DONE AND ORDERED.

## REPORT AND RECOMMENDATION

CHARLES R. WILSON, United States Magistrate Judge.

THIS CAUSE is before the Court upon the Petition for Injunction Under Section 10(*l*) of the National Labor Relations Act, as Amended (doc. 1).[1] The Court has considered the petition, the memoranda and exhibits of record, the argument of counsel at the hearing conducted on July 16, 1991, and is otherwise fully advised in the premises. Based on the following findings of fact and conclusions of law, the Court finds that the Petitioner's theory of liability is not insubstantial or frivolous, and recommends that the petition be granted.

### Findings of Fact

1. Jurisdiction of this Court is invoked pursuant to § 10(*l*) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 160(*l*). (Petition, § 2).

2. Petitioner is the Regional Director of Region 12 of the National Labor Relations Board (the "Board"). (Petition, § 1).

3. The petition, filed with the Court on June 12, 1991, seeks appropriate injunctive relief pending the final disposition of a consolidated complaint issued by the Regional Director on June 11, 1991.

4. The petition, based upon charges filed by Coastal Stevedoring Co., ("Coastal"), Canaveral Port Authority ("CPA"), and by Port Canaveral Stevedoring, Inc. ("Canaveral"), alleges that Respondent International Longshoremen's Association, AFL–CIO ("ILA"), has engaged in and is engaging in unfair labor practices proscribed by NLRA §§ 8(b)(4)(ii)(B), affecting commerce within the meaning of NLRA §§ 2(6) and (7), 29 U.S.C. § 152(6)–(7). (Petition, § 3).

---

**1.** This matter was referred to the undersigned for report and recommendation by United States District Judge Wm. Terrell Hodges.

5. The petition also alleges that the Regional Director has reasonable cause to believe that the allegations set forth in the charges and amended charge and in the complaint are true. (Petition, § 5).

6. The ILA is an unincorporated association in which employees participate and which exists for the purpose, in whole or part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work. The ILA represents American longshoremen in East and Gulf Coast ports from Maine to Texas, in Puerto Rico, Canada and the Great Lakes. ILA-affiliated locals represent longshoremen in the ports of Tampa, Jacksonville, Miami, Port Saint Joe, West Palm Beach, Fort Lauderdale, and Fort Pierce, Florida. One of the ILA's vice-presidents maintains an office at 707 E. Harrison St., Tampa, Florida, and the ILA has, at all times relevant to the petition, been engaged within this judicial district in transacting business and in promoting and protecting the interests of its employee members.

7. At all times relevant to the petition, Coastal, a Florida corporation with an office and place of business in Ft. Pierce, Florida, has performed stevedoring work for shipping companies and is an employer engaged in commerce within the meaning of §§ 2(2), (6) and (7) of the NLRA.

8. At all times relevant to the petition, Canaveral has been owned by its general partner, Port Canaveral Stevedoring, Inc., and limited partners Patrick T. Lee, W.T. Cox, Jr., Mather Ward, George Scheidler, and the Ben Pekin Family Partnership, and has done business as, and traded under the name of, Port Canaveral Stevedoring Limited. Canaveral has an office and place of business in Port Canaveral, Florida, and has been engaged in business as a stevedoring company and an employer engaged in commerce within the meaning of §§ 2(2)(6) and (7) of the NLRA.

9. At all times relevant to the petition, John Bowers and Ernest Lee have been respectively the President and Special Consultant of the ILA and have been agents of the ILA within the meaning of Section 2(13) of the Act.

10. At all times relevant to the petition, the ILA has been engaged in a primary labor dispute with Coastal, Canaveral, and other non-union stevedoring companies operating at Fort Pierce and Port Canaveral, and other ports in the State of Florida.

11. At no time relevant to the petition has the ILA been engaged in a labor dispute with CPA or with exporters, importers, shipping companies, or shipping agents involved in the shipment of citrus fruit out of the ports of Ft. Pierce and Port Canaveral, Florida, to Japan.

12. Japanese companies import from Florida American citrus fruits which are unloaded from oceangoing vessels in Japanese ports by Japanese dockworkers who are represented by Japanese unions and who are employed exclusively by Japanese stevedores.

13. The Japanese importers engage foreign shipping lines, principally Japanese, but also European, to transport the fruit from Florida to Japan.

14. Prior to the 1990–91 shipping season, these vessels called at the ports of Fort Pierce and Canaveral, Florida, where the foreign shipping companies or their agents engage American stevedores to load the fruit on the ships. Two of these America stevedores, Coastal and Canaveral, are charging parties in this case.

15. Coastal, Canaveral and other stevedores in the Florida ports use non-union longshore labor to load the citrus fruit bound for Japan.

16. The ILA, disturbed by the use of non-union longshore labor in Fort Pierce and Port Canaveral, sent representatives to Japan to consult with Japanese unions. An April 10, 1990 notice from Shoshiro Nakanishi, President of the Japanese Seamen's Union, to Japanese shipping companies indicated that the ILA representatives "said that if the present situation continues, they will have no recourse but to protest and strike." The notice requested that, "in order to maintain order at the ports and to reduce U.S.-Japan trade friction," the com-

panies direct those concerned to give the job of loading Florida export citrus fruit to loading companies that hire ILA union employees. (Exhibit 9.2 to Petition).

17. By letter dated October 4, 1990, ILA President John Bowers informed Toshio Kamezaki, President of the National Council of Dockworker's Unions of Japan, of the measures the ILA planned to take to prevent the use of non-union and alien labor at Fort Pierce and Port Canaveral:

Because of the flagrant and continued use of non-union and alien labor by stevedoreing [sic] companies, contracted for the citrus fruit loading of Japanese merchant ships at the ports of Port [sic] Pierce and Port Canaveral, we are committed to the effective picketing of these operations. Such actions are forming and imminent.

As these union actions develop, we hope to have your support in a form which will bring this matter to the attention of the Japanese people, your government and the Japanese shippers and importers who are directly and indirectly involved. I am hopeful that we can provide you with photographs and descriptive material which will aid in your effort.

Your further support in denying the unloading and landing of these picketed products in your country will also be most helpful to the members of the International Longshoremen's Association and organized labor in the United States which supports our effort.

(Exhibit 6 to Petition).

18. On October 22, 1990, President Nakanishi sent another notice to the shipping companies and an identical notice to importers, reminding them of the April 10, 1990 notice, and warning them that the "ILA has informed us of their decision to show resistance by picketing at Fort Pierce Port and Port Canaveral." The notice then states that, "In order to avoid trouble at the above harbors, we again respectfully request that your company will direct those concerned to give the job of loading Florida citrus fruit for export to loading companies that hire ILA union employees." (Exhibit 9.3 to Petition).

19. On October 29, 1990, the Chairman of the Japanese Longshoremen's Labor Union sent a letter to all officials, managers, union chairmen, and local harbor chairmen informing them of the October 4, 1990 letter from the ILA requesting cooperative action concerning citrus fruit exported from Florida. The Chairman indicated that

The ILA has been addressing this problem for several years. Chairman Bowers came to Japan two years ago and the Florida division representative came this spring to confer with Japanese merchants and shipping companies. However, since the problem has still not been solved, the ILA has decided to picket at the sites, and has requested Japanese cooperation.

(Exhibit 9.6 to Petition).

20. As a result of these communications and appeals, the various Japanese importers, shippers, etc., communicated directly or through their foreign carriers and agents (such as Cool Carriers of Stockholm and Cool Carriers (USEC), Inc., of Florida) with Coastal, Canaveral, and other entities in the State of Florida, advising them of their concerns regarding potentially impeded loading of citrus products in the ports of Fort Pierce and Port Canaveral, Florida and the unloading of the products in Japan. Specifically, Nissui Shipping Tokyo indicated to Coastal on October 29, 1990 that "We received the notice from 'ILA' through 'JSU' to use their own union member for loading citrus at Fort Pierce and Canaveral if not so they will carry out picket." (Exhibit 13.1 to Petition). Similarly, JRC Tokyo informed Coastal on November 14, 1990 that "... we worry about if ILA/JSU take a strong measure (go on picket a vessel.), we can not block this action, loading/discharging work at both end and delay vessel operation/loss big money." (Exhibit 13.4 to Petition). Japan Reefer Carrier notified Coastal of problems at the ports on November 6, 1990:

Recently we, as a carrier, have received following petition letter from Japan Seamens Union. (Quote) ILA has

decided to go on picket a vessel, if shipping company intend to load grapefruit for Japan without using ILA member for the past few years at Port Canaveral and Fort Pierce. Therefore please instruct to your stevedore company to use ILA member. (Unquote) According to Japanese importer of Florida grapefruit they also received similar contents of above letter from all Japan port labor union ... We would like to know present situation at your end and receive your comment/view to the above matter soonest [sic] possible. Otherwise we have no alternative but to assign [sic] our grapefruit loader to port of Tampa in order to avoid dispute at Fort Pierce [sic] and also discharging ports in Japan.

(Exhibit 13.2 to Petition). Other entities expressed similar concerns. (Exhibits 17, 19, 26.1–26.2, A6 and 7 (Lee) to Petition).

21. The ILA's communications, and the Japanese unions' responses to these communications, were also received by numerous United States neutrals, including the Canaveral Port Authority, Florida growers such as Seald Sweet and Indian River; as well as several foreign neutrals who either had agents in Florida or did substantial business in Florida.

22. Upon its failure to obtain assurances that union-represented longshoremen would handle its products in the Port of Fort Pierce, Sumisho, one of the Japanese importers, directed its carrier, Cool–Stockholm, to order its vessel to proceed to the Port of Tampa for loading on November 6, 1990. (Exhibits 19, 20, 21 and 22 to Petition).

23. Similar decisions by the Japanese importers were repeated on several subsequent occasions, when they directed their vessel carriers to proceed to the Port of Tampa where the citrus was loaded by ILA-represented longshoremen. (Exhibit 18 to Petition).

24. By letter dated November 6, 1990, ILA Special Consultant Ernest S. Lee notified Kamezaki that the M/V Bango El Triunfo, a Panamanian ship operated by Cool Carriers, was diverted from Port Canaveral to Tampa, Florida, where it would be handled by the ILA. Lee indicated that "the ILA was prepared to picket the M/V Bango El Triunfo and is continuously ready to picket other ships scheduled to load non-union at Port Canaveral and Fort Pierce, Florida." (Exhibit 8 to Petition).

25. This situation continued throughout the 1990–91 shipping season. (Exhibit 18 to Petition).

26. The Board filed a petition for a preliminary injunction against the ILA after the Regional Director, in consultation with the General Counsel of the Board, made a determination based upon the foregoing facts that there is reasonable cause to believe that the ILA has engaged in and is continuing to engage in an unlawful secondary boycott, in violation of Section 8(b)(4) of the Act.

27. The Board's petition seeks preliminary injunctive relief pending final Board adjudication under Section 10($l$), 29 U.S.C. § 160($l$).

28. Any finding of fact made herein which constitutes a conclusion of law is hereby adopted as such.

### Conclusions of Law

1. For Section 10($l$) purposes, the function of the Court is not to determine whether an unfair labor practice has in fact been committed, but simply to determine whether there is reasonable cause to believe that a violation of the Act has occurred and whether an injunction is just and proper. *Baldovin v. International Longshoremen's Ass'n,* 626 F.2d 445, 454 (5th Cir.1980); *Boire v. International Brotherhood of Teamsters,* 479 F.2d 778, 787 (5th Cir.1973).[2] The "reasonable cause" standard is satisfied where there is a reasonable basis upon which the NLRB would be able to sustain its charge before the Board. *Id.* Reasonable cause exists if the Regional Director's factual allegations

**2.** The case law of the Fifth Circuit prior to September 30, 1981 has been adopted as precedent in this judicial circuit. *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc).

and legal theory are not insubstantial and frivolous. *Lewis v. New Orleans Clerks & Checkers, I.L.A. Local No. 1497,* 724 F.2d 1109 at 1115 (5th Cir.1984). Even where the Director's legal theories are "novel" or "untested" the district court may appropriately order the injunction where equitably proper and where necessary to preserve the Board's jurisdiction. *Baldovin,* 626 F.2d at 454.

2. The Board concedes that many of the legal theories argued in this case could be considered "novel" or "untested." Here, the Board maintains that the ILA violated Section 8(b)(4) of the NLRA, 29 U.S.C. § 158(b)(4). Section 8(b)(4) makes it unlawful for a union to "threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce" with an object of forcing that person to cease doing business with any other person. This provision prohibits a union that has a dispute with one employer, the "primary," from pressuring other "secondary" employers who deal with the primary, where the union's conduct is calculated to force the secondary to cease dealing with the primary and thus increase the union's leverage in its primary dispute. *National Woodwork Mfrs. Ass'n v. NLRB,* 386 U.S. 612, 632–34, 87 S.Ct. 1250, 1261–63, 18 L.Ed.2d 357 (1967).

3. In this case the ILA is engaged in primary disputes with domestic companies Coastal and Canaveral. The Board contends that the ILA threatened to picket and protest against merchant ships employing non-union longshoremen, caused the Japanese Dockworkers to threaten to refuse to unload any citrus fruit loaded by the primaries, and further caused the Dockworkers and the Japan Seamen's Union to communicate the threat of labor unrest and work stoppage to the neutral parties which do business with the primaries. The ILA allegedly created this threat with the purpose or "object" of pressuring the neutral secondary parties to sever their business relationships with the primaries in the United States.

4. The Court notes that, had the ILA directly threatened secondary employers with activity in the United States, this scenario would be a classic secondary boycott prohibited by Section 8(b)(4). The conduct at issue here, however, distinguishes this case from any NLRA case decided to date. The ILA contends that its communications to the Japanese unions, which were ultimately conveyed to neutral secondary employers, cannot be construed as threats violative of the NLRA. Further, the ILA maintains that since the allegedly illegal activity occurred in Japan, it was not "in commerce" and was therefore not within the purview of the NLRA and the NLRB's jurisdiction.

### The "In Commerce" Issue and the Applicability of the NLRA

5. Section 8(b)(4)(ii) prohibits a labor organization or its agents from threatening, coercing or restraining any person "engaged in commerce or in an industry affecting commerce" with the objective of forcing or requiring the person to cease doing business with any other person.

6. As defined in Section 2(7), the term "affecting commerce" means "in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce." 29 U.S.C. § 152(7). The term "in commerce," as defined in Section 2(6), expressly includes trade "between any foreign country and any State." 29 U.S.C. § 152(6). In light of the NLRA's broad definitions, it appears that the Japanese unions, shipowners, stevedores and importers could all be considered "persons engaged in commerce or in an industry affecting commerce."

7. The ILA, however, contends that a line of United States Supreme Court cases narrows the NLRA definition of "commerce" so that only activities in *domestic commerce* are covered. It maintains that the NLRA does not apply here because the activity causing harm to the primary employers, i.e., the refusal to unload ships loaded by non-union labor in the United States, would be carried out in Japanese ports by Japanese dockworkers who are

represented by Japanese unions and employed by Japanese stevedores. The ILA argues that this activity does not involve United States commerce, therefore the NLRB does not have jurisdiction.

8. The ILA relies on several United States Supreme Court cases as support for its "domestic commerce" theory.[3] *Benz* involved an American union's picket protesting shipboard conditions affecting the foreign crew; *McCulloch* concerned a Board-ordered election among the foreign crewmen on a foreign ship; *Incres* involved an American union's picket demanding the right to organize a foreign crew; *Windward* concerned an American union's picket protesting substandard wages paid to foreign crews; and *Mobile* addressed the secondary effects of the conduct at issue in *Windward.* In each of these cases, the Court addressed activity *directed against foreign interests.* The Court concluded that the NLRA did not apply and that the NLRB did not have jurisdiction because the American union activity was directed against foreign labor relations and was not calculated to impose harm on any domestic entity. The Court refused to interfere with the internal affairs of foreign entities and sought to avoid a potential conflict with principles of comity in international maritime trade. *See McCulloch*, 372 U.S. at 17, 83 S.Ct. at 675 (to construe the Act to embrace the "internal discipline and order" of a foreign ship would be to impute to Congress the highly unlikely intention of departing from the established rule that the law of the flag state ordinarily governs the internal affairs of the ship).

9. The Court finds that the Board's jurisdictional theory is not frivolous because three reasonable bases exist for contending that the Supreme Court's restricted definition of "commerce" is not applicable here. First, this case differs from *Benz* and its progeny because the ILA activity at issue, although mostly occurring in Japan, nevertheless was directed against *domestic entities*, Coastal and Canaveral. The ILA's efforts were arguably calculated to harm any domestic employer using non-union labor to load Florida citrus fruit. Clearly this case involves "industrial strife between American employers and employees," which the NLRA was designed to regulate.[4] *See Benz*, 353 U.S. at 143–44, 77 S.Ct. at 702–703.

10. Second, application of United States law to resolve this primary dispute does not threaten interference in the internal affairs of foreign-flag ships likely to lead to conflict with foreign or international law. On the contrary, the Board seeks to regulate the ILA's activities in such a way as to ultimately preclude the ILA's interference in the affairs of foreign-flag ships. As discussed in the next section of this report, record evidence indicates that the ILA has been influencing, and perhaps coercing, Japanese entities to cooperate in its boycott so that they will not be exposed to ILA pickets and other disruptive activity at American ports. The Board, by regulating the ILA and prohibiting its coercive involvement on Japanese affairs, would in effect restrict and decrease American influence in the internal affairs of foreign-flag ships. Further, the Board's jurisdiction and power to enjoin acts violative of the NLRA extends only to the ILA and other American entities and individuals; the Japanese entities would remain unaffected and free to take whatever course of action they desire. The Japanese entities, however, would be free of the allegedly coercive influence of the ILA, whose activity

---

3. *American Radio Ass'n v. Mobile S.S. Ass'n,* 419 U.S. 215, 95 S.Ct. 409, 42 L.Ed.2d 399 (1974); *Windward Shipping v. American Radio Ass'n,* 415 U.S. 104, 94 S.Ct. 959, 39 L.Ed.2d 195 (1974); *Incres S.S. Co. v. International Maritime Workers,* 372 U.S. 24, 83 S.Ct. 611, 9 L.Ed.2d 557 (1963); *McCulloch v. Sociedad Nacional,* 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963); *Benz v. Compania Naviera Hidalgo,* 353 U.S. 138, 77 S.Ct. 699, 1 L.Ed.2d 709 (1957).

4. Respondent cites *EEOC v. Arabian American Oil Co.,* — U.S. ——, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) as being dispositive of this case. The Court disagrees. In *EEOC,* the Supreme Court held that Title VII's protections do not extend to American citizens employed abroad by American companies. Here, the parties seeking protection under the NLRA are domestic entities, and the Board has reasonable cause to believe that the NLRA grants it jurisdiction to protect these parties.

the Court holds is arguably within the Board's jurisdiction.

11. Third, the Board has reasonable cause to maintain that it should be permitted to invoke the NLRA to prevent injury to secondary neutrals, especially American neutrals and foreign neutrals doing business in the United States, resulting from this dispute between American employers and employees. The Supreme Court emphasized in *International Longshoremen's Ass'n v. Allied Int'l, Inc.*, 456 U.S. 212, 102 S.Ct. 1656, 72 L.Ed.2d 21 (1982), that Section 8(b)(4) was broadly drafted to protect neutral parties, "the helpless victims of quarrels that do not concern them at all." *Id.* at 225, 102 S.Ct. at 1664 (quoting H.R.Rep. No. 245, 80th Cong., 1st Sess. 23 (1947)). Although *Allied* involved an American union's order to its American members not to work for American stevedores, the Court concludes that the Board has a reasonable basis for extending the protection to neutrals accorded in *Allied* even where the union allegedly used foreign entities to achieve its illegal object.

### The ILA's Communications and the FLRA

12. Having found that the Board has reasonable cause to believe that the allegedly illegal activity was within the purview of the NLRA, the Court must now address whether the Board has reasonable cause to believe that the ILA's communications, which were ultimately conveyed to neutral secondary employers, could be construed as threatening or coercive so as to violate the NLRA.[5]

13. The ILA maintains that its communications and contact with Japanese officials cannot be characterized as threatening or coercive in nature; it contends that the ILA merely requested Japanese cooperation and that the Japanese entities, of their own accord, agreed to refuse to unload any citrus shipments from Florida which were loaded by non-union labor. On the other hand, the Board contends that the

ILA's communications could reasonably be characterized as threatening and coercive, and ultimately calculated to divert ships transporting Florida citrus to ports serviced by the ILA. In making its determination, the Court relies upon the following facts:

a. The record evidence indicates that the ILA's concerns regarding the use of non-union labor prompted it to send representatives to Japan to warn Japanese union officials that, if the use of non-union labor continued, it would have no recourse but to protest and strike.

b. The record evidence also indicates that, when the ILA realized that Japanese shippers, importers, etc. were continuing to use stevedoring companies employing non-union labor, the ILA president informed the Japanese union president that the ILA was committed to "the effective picketing" of Japanese merchant ships using non-union labor at the ports of Fort Pierce and Port Canaveral. He stated that the picketing was "forming and imminent." More importantly, the ILA *specifically requested* in the letter that the union bring the matter to the attention of the Japanese people, the Japanese government, and Japanese shippers directly and indirectly involved. The ILA also indicated that the Japanese unions' further support in denying the unloading and landing of the picketed products in Japan would be "most helpful" to the ILA. (Exhibit 6 to Petition).

c. On October 22, 1990, the Japanese union informed the shipping companies and importers that the ILA planned to picket and that, "in order to avoid trouble" at the ports, the companies should comply with the ILA's request and use stevedoring companies employing union labor. (Exhibit 9.3 to Petition). On October 29, 1990, the union informed its officials of the ILA's decision to picket at the Florida sites. (Exhibit 9.6 to Petition).

d. The Japanese importers, shippers, etc. then informed the primary employers and the domestic secondaries of their con-

---

5. As previously indicated, Section 8(b)(4)(ii) provides that it is illegal for a union to "threaten, coerce, or restrain any person engaged in commerce or an industry affecting commerce," with an object of forcing that person to cease doing business with any other person.

cerns. All mentioned the threatened picket, and some explicitly indicated that they feared the threatened ILA picket and trouble at the ports.

e. On November 6, 1990, the ILA "was very happy to inform" the Japanese union president that a Panamanian ship had been diverted from Port Canaveral to Tampa, Florida to be loaded by ILA members. The ILA indicated that it had been prepared to picket the Panamanian ship and emphasized that it was "continuously ready to picket other ships scheduled to load nonunion at Port Canaveral and Fort Pierce, Florida." The ILA also stated that "your continued efforts on our behalf will be most appreciated." (Exhibit 8 to Petition).

14. Based upon the foregoing facts, the Court concludes that the Board has reasonable cause to maintain that the ILA violated Section 8(b)(4) because the ILA's communications arguably threatened and coerced neutral secondaries to cease doing business with the primary employers in order to avoid pickets and other "trouble" at the ports. Further, the Board has reasonable cause to allege that the specter of imminent ILA protests and labor unrest at the ports, coupled with the specific request by the ILA to the Japanese unions, prompted the Japanese unions to threaten to refuse to unload in Japan goods that had been loaded in the United States by nonunion stevedoring companies operating at Fort Pierce and Port Canaveral, Florida.

15. The Court finds that record evidence indicates that the Board has reasonable cause to believe that the ILA adopted and encouraged the Japanese union's threatened refusal to unload citrus fruit in Japan that was loaded by non-union labor in Fort Pierce and Port Canaveral, Florida. See International Ass'n of Heat and Frost Insulators (Preformed Metal Products Co.), 163 NLRB 557, 560 (1967) (responsibility for work stoppage attributed to union where it "adopted, ratified and supported" individual's refusal to work).

16. The Court also concludes that the Board has reasonable cause to believe that the ILA had a "cease doing business" object prohibited by Section 8(b)(4)(ii)(B). The

ILA's object may be inferred by the reasonably foreseeable consequences of its conduct. See Allied, 456 U.S. at 224, 102 S.Ct. at 1663. Here, the ILA specifically requested that the Japanese union convey its threat to the Japanese shippers and importers. As argued by the Board, the ILA could reasonably foresee that its communications would disturb the Japanese entities and that these entities would convey their concerns to American exporters. Finally, the ILA could reasonably foresee that, to avoid trouble at the American ports and to avoid the possibility that their ships would not be unloaded in Japan, the neutrals doing business in the United States would sever their ties with the primaries and divert their business to ILA-serviced facilities.

### Conclusion

Based upon the foregoing findings of fact and conclusions of law, the Court concludes that the Board has reasonable cause to believe 1) that it has jurisdiction pursuant to the NLRA over this dispute; and 2) that the ILA has engaged in, and is engaging in, acts and conduct in violation of the NLRA, affecting commerce within the meaning of Section 2(6) and (7) of the NLRA, and that such acts and conduct will likely be repeated or continued unless enjoined. The Court also concludes that the imposition of injunctive relief here would be just and proper. Accordingly, it is hereby

RECOMMENDED that the District Court grant the Board's Petition for Injunction Under Section 10(l) of the National Labor Relations Act, as Amended, and restore the status quo pending a final Board order, as set forth in the proposed order attached hereto as Exhibit "A."

So recommended this 1st day of August, 1991.

### NOTICE TO PARTIES

Failure to file and serve written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date it is served on the parties shall bar an aggrieved party

from a *de novo* determination by the District Court of issues covered in the report, and shall bar the party from attacking on appeal factual findings in the report accepted or adopted on appeal by the District Court except upon grounds of plain error or manifest injustice. 28 U.S.C. § 636(b)(1)(C); Local Rule 6.02; *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir.1982) (en banc).

EXHIBIT "A"

United States District Court Middle District of Florida Tampa Division

FRANCIS E. DOWD, Regional

Director of Region 12 of the

National Labor Relations Board,

for and on behalf of the

NATIONAL LABOR RELATIONS BOARD,

Petitioner,

vs.

INTERNATIONAL LONGSHOREMEN'S

ASSOCIATION, AFL–CIO

Respondent.

CASE NO. 91–742–Civ–T–98A

TEMPORARY INJUNCTION

THIS CAUSE came on for consideration upon the verified petition of Francis E. Dowd, Regional Director of Region 12 of the National Labor Relations Board (the "Board"), for and on behalf of the Board, for a temporary injunction pursuant to Section 10(*l*) of the National Labor Relations Act, as amended, pending the final adjudication of the matters involved before the Board, and upon the issuance of an order to show cause why injunctive relief should not be granted.

Upon consideration of the report and recommendation of the Magistrate Judge and upon this Court's independent examination of the file, the Magistrate Judge's report and recommendation is hereby adopted and made a part hereof, and it is hereby

ORDERED that:

The Board's Petition for Temporary Injunction Pursuant to Section 10(*l*) of the National Labor Relations Act, as Amended, is GRANTED as follows:

(a) Pending the final adjudication of the matters involved before the National Labor Relations Board, Respondent International Longshoremen's Association, AFL–CIO, its officers, representatives, agents, servants, employees, attorneys, and all members and persons acting in concert or participation with them are hereby enjoined and restrained from:

(1) In any manner or by any means, including requests or appeals, or any like or related conduct, or by permitting such to remain in existence or effect, threatening, coercing or restraining shipping agents, shipping companies, citrus exporters, citrus importers, the Canaveral Port Authority, and other persons engaged in commerce or in an industry affecting commerce, who are neutral to the dispute between Respondent and Coastal and between Respondent and Canaveral and other non-union stevedoring companies operating at Port Canaveral, Florida, where an object thereof is to force or require them to cease doing business with Coastal, and with Canaveral, and other non-union stevedoring companies operating at Port Canaveral, Florida, and with each other, and to otherwise alter their business relationships related to the shipment of citrus fruit from Ft. Pierce and Port Canaveral, Florida to Japan;

(2) Acting upon, or giving any effect to, its letter of October 4, 1990, signed by John Bowers, to the National Council of Dockworker's Unions of Japan.

(b) Pending the final adjudication of the matters involved before the National Labor Relations Board, Respondent International Longshoremen's Association shall, within twenty (20) days of the date of this Order, affirmatively rescind, repudiate, and disavow, in writing, its letter of October 4, 1990, signed by John Bowers, to the National Council of Dockworker's Unions of Japan. Respondent International Long-

shoremen's Association shall also, within thirty (30) days of the date of this Order, file with the Court evidence that the National Council of Dockworker's Unions of Japan has received notice of such disavowal.

DONE and ORDERED in Chambers in Tampa, Florida, this ___ day of _____, 1991.

_____

UNITED STATES DISTRICT JUDGE