Francis E. DOWD, Regional Director of Region 12 of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Plaintiff–Appellee,

v.

INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL–CIO, Defendant–Appellant.

No. 91–3908.

United States Court of Appeals, Eleventh Circuit.

Oct. 15, 1992.

Ernest L. Mathews, Jr., Herzl S. Eisenstadt, New York City, for defendant-appellant.

J. David Richeson, James G. Brown, Richeson & Brown, Orlando, Fla., for amicus curiae Coastal Stevedoring Co.

Ellen A. Farrell, Laura Goodman, NLRB, Washington, D.C., Margaret Diaz, NLRB, Tampa, Fla., for plaintiff-appellee.

Paul M. Heylman, Robert L. Duston, Washington, D.C., for amici curiae Canaveral Stevedoring, Inc. and the Canaveral Port Authority.

Before BIRCH, Circuit Judge, JOHNSON *, and BOWNES**, Senior Circuit Judges.

BIRCH, Circuit Judge:

In this case we must decide whether an American labor union which induces a foreign union to pressure foreign importers engaged in commerce, with the purpose and effect of establishing a secondary boycott in the United States, commits a violation of the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* (1988) ("NLRA"). Finding that the Regional Director of the National Labor Relations Board (the "Board") had articulated a substantial legal and factual basis to support a finding that unfair labor practices had been committed, the district court imposed a temporary injunction under section 10(*l*) of the NLRA. 781 F.Supp. 1565. We AFFIRM.

I.

For the past several years, Florida grapefruit has been shipped to Japan from Fort Pierce and Port Canaveral pursuant to agreements between American exporters and Japanese importers. The International Longshoremen's Association ("ILA") is engaged in a labor dispute with Coastal Stevedoring Company ("Coastal") and Port Canaveral Stevedoring Limited ("Canaveral"), which operate from Fort Pierce and Port Canaveral respectively. Both Coastal and Canaveral use non-union labor to load shipments of grapefruit bound for Japan, where the fruit is unloaded by employees of Japanese stevedoring companies.

Prior to the 1990–1991 shipping season, ILA delegates visited Japan and met with representatives of the National Council of Dockworkers' Unions of Japan, the Japan Labor Union Association, and the Japan Seamen's Union (collectively, the "Japanese Unions"). The ILA expressed its concern over the use of non-union labor at several Florida ports and requested the assistance

---

* *See* Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

** Honorable Hugh H. Bownes, Senior U.S. Circuit Judge for the First Circuit, sitting by designation.

of the Japanese Unions in pressuring participants in the citrus trade to use stevedoring companies which employ union labor. In various communications, widely disseminated among participants in the grapefruit export industry, Japanese Union officials requested that importers ensure that the fruit they purchased was loaded in Florida by stevedoring companies that hire *union* employees. Further, these communications warned that dockworkers belonging to the Japanese Unions would refuse to unload fruit loaded in American ports by non-union labor.

In a letter dated October 4, 1990, ILA president John M. Bowers informed Toshio Kamezaki, president of the National Council of Dockworkers' Unions of Japan, of ILA's plans to picket Coastal and Canaveral. He stated that "[y]our further support in denying the unloading and landing of these picketed products in your country will also be most helpful to the members of the International Longshoremen's Association...." R1–24–6.

Several Japanese importers expressed their concern to Florida exporters and stevedoring companies that Japanese dockworkers would not handle fruit loaded in Florida by non-union labor. Subsequent communications reveal that, as a result, at least one ship was diverted from Fort Pierce, where it would have been handled by non-union labor, to Tampa, where it was loaded by longshoremen represented by ILA. In a letter to the National Council of Dockworkers' Unions of Japan dated November 6, 1990, ILA special consultant Ernest Lee noted that the diversion of this ship to Tampa was "a direct result of your very timely and effective notices to relevant parties in Japan of your support for our efforts." R1–1–Ex. 8. Further, Lee noted that "[y]our continued efforts on our

behalf will be most appreciated." *Id.* These efforts continued with demonstrated success. After news of the boycott threatened by the Japanese Unions on behalf of ILA filtered through the industry, neither Canaveral nor Coastal handled another shipment of citrus bound for Japan for the remainder of the 1990–1991 export season.

On June 14, 1991, the Board filed a petition for injunction pursuant to section 10($l$) of the NLRA alleging that there was reasonable cause to believe that ILA had threatened, coerced, or restrained neutral persons to cease doing business with Coastal and Canaveral in violation of NLRA section 8(b)(4)(ii) and that injunctive relief was just and proper. The magistrate judge issued a report and recommendation that the petition be granted.

Following review of the record, the district court adopted the report of the magistrate judge and ordered ILA, pending a final adjudication by the Board, to refrain from threatening persons neutral to the dispute with Coastal and Canaveral and to repudiate its written request soliciting the aid of the Japanese Unions.

II.

Section 8(b)(4)(ii)(B) of the NLRA prohibits coercion or refusals to deal aimed at employers or others not principally involved in an underlying labor dispute, i.e., "secondary" or "neutral" employers, while preserving the right of labor organizations to bring such pressure against employers *primarily* involved in the dispute.[1] Section 10($l$) of the NLRA is thus an exception to the general prohibition in the Norris–LaGuardia Act, 29 U.S.C. § 101 *et seq.* (1988) against federal injunctions in labor disputes. Section 10($l$) authorizes the district court to grant interim injunctive relief

---

**1.** Section 8(b) provides that "[it] shall be an unfair labor practice for a labor organization or its agents ...

  (4)(ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is ...

  (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other ...

person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees.... *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing...." 29 U.S.C. § 158(b).

pending the Board's resolution of charges involving certain labor practices, such as the secondary boycott at issue here, which are likely to have a particularly disruptive effect upon the flow of commerce. 29 U.S.C. § 160(*l*).

■ When confronted with a petition for injunction under section 10(*l*), the "function of the District Court is not to determine whether an unfair labor practice has in fact been committed, but simply to determine whether there is reasonable cause to believe that a violation of the [National Labor Relations] Act has occurred." *Baldovin v. International Longshoremen's Ass'n*, 626 F.2d 445, 454 (5th Cir.1980). The district court's inquiry into reasonable cause "is limited to evaluating whether the Board's 'theories of law and fact are not insubstantial and frivolous.'" *Arlook v. S. Lichtenberg & Co.*, 952 F.2d 367, 371 (11th Cir.1992), (quoting *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1189 (5th Cir.1975), *cert. denied*, 426 U.S. 934, 96 S.Ct. 2646, 49 L.Ed.2d 385 (1976)).[2] This deferential review is appropriate at the injunction stage even where the theory underlying the petition is "untested" or "novel," in order to preserve the legal issue for Board determination. *Boire v. International Brotherhood of Teamsters*, 479 F.2d 778, 789 (5th Cir.1973). In addition to demonstrating reasonable cause to believe that an unfair labor practice has occurred, the Board must show that equitable relief is "just and proper" under the circumstances. 29 U.S.C. § 160(*l*); *Arlook*, 952 F.2d at 372.

■ The conclusion of the district court that the Board has presented a substantial and not frivolous legal theory is subject to our plenary review on appeal. *Arlook*, 952 F.2d at 372. Neither the Board's evidentiary showing nor the equitable propriety of the injunction has been questioned by ILA. ILA challenges only the Board's legal theory, arguing that ILA did not "threaten, coerce, or restrain" any person as required by section 8(b)(4)(ii)(B), and that the conduct of the Japanese Unions, while clearly of the type proscribed by this section, may not be attributed to ILA. Further, ILA contends that the district court had no jurisdiction to grant an injunction because the conduct at issue occurred beyond the territorial scope of the NLRA. We find it instructive to address the jurisdictional issue after first considering ILA's objection that its conduct does not fall within the language of section 8(b).

### III.

■ ILA argues that it did not "threaten, coerce, or restrain" any person in commerce, as required to find a violation of section 8(b)(4)(ii), but merely requested the aid of the Japanese Unions, who in turn threatened various Japanese importers. The Board urges us to attribute the conduct of the Japanese Unions to ILA based on theories of agency, ratification, and joint venture.[3] ILA maintains that the record is

---

**2.** Although *Arlook* involved a petition under section 10(j), the determination of reasonable cause under that section does not differ from that applicable to a section 10(1) petition. *Boire v. Teamsters*, 479 F.2d 778, 787 n. 7 (5th Cir. 1973). Further, two other circuits have recently described the reasonable cause standard for a petition under 10(*l*) in the terms used in *Arlook*. See *Hoeber v. Local 30, United Slate, Tile & Composition Roofers*, 939 F.2d 118, 123 (3rd Cir.1991); *Gottfried v. Sheet Metal Workers' Int'l Ass'n, Local Union No. 80*, 927 F.2d 926, 927 (6th Cir.1991).

**3.** ILA argues that the district court erred by rejecting the agency theory proposed by the Board and substituting another rationale for granting the petition. The report adopted by the district court does appear to rely in part upon the theory that ILA violated 8(b)(4)(ii) by informing the Japanese Unions of its own intention to picket Coastal and Canaveral directly. The Board did not proceed on this theory in its petition, nor does it appear that the injunction could be sustained upon this ground. Section 8(b)(4)(ii)(B) exempts picketing against entities, such as Coastal and Canaveral, which are involved as *primary* actors in the underlying labor dispute. It does not seem that ILA's threats to picket Coastal and Canaveral, even if communicated to neutrals via the Japanese Unions, would violate section 8(b)(4)(ii). We are, however, not required to decide this issue. Even if its theory is legally sound of its own merit, the district court may not uphold action by an administrative agency on a ground not advocated by the agency. *SEC v. Chenery Corp.*, 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943); *First Nat'l Maintenance Corp. v. NLRB*, 452 U.S. 666, 672 n. 6, 101 S.Ct. 2573, 2577 n. 6, 69

devoid of any evidence that the dealings between ILA and the Japanese Unions satisfy the formal requisites of an agency or joint venture relationship, or to support the Board's theory of ratification.

■ When adjudicating an unfair labor practice under the NLRA, common law concepts of agency are to be applied broadly to effectuate the statutory purpose. In condemning certain unfair labor practices by an employer, the Supreme Court stated:

> The employer, however, may be held to have assisted the formation of a union even though the acts of the so-called agents were not expressly authorized or might not be attributable to him on strict application of the rules of respondeat superior. We are dealing here not with private rights nor with technical concepts pertinent to an employer's legal responsibility to third persons for acts of his servants, but with a clear legislative policy to free the collective bargaining process from all taint of an employer's compulsion, domination, or influence.

*International Ass'n of Machinists*, 311 U.S. 72, 80, 61 S.Ct. 83, 88, 85 L.Ed. 50 (1940) (citation omitted). *See also H.J. Heinz Co. v. NLRB*, 311 U.S. 514, 521, 61 S.Ct. 320, 323, 85 L.Ed. 309 (1941). "Transplantation of ordinary agency law, which arises out of ordinary contract and tort disputes, into the NLRA context necessarily requires sensitivity to the particular circumstances of industrial labor relations. Courts have concluded that under the NLRA, agency principles must be expansively construed, including when questions of *union* responsibility are presented." *Local 1814, Int'l Longshoremen's Ass'n v. NLRB*, 735 F.2d 1384, 1394 (D.C.Cir.), *cert.*

*denied*, 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984). Against this backdrop, we conclude that the Board has articulated a substantial and not frivolous legal theory upon which to attribute the actions of the Japanese Unions to ILA.

#### A.

Initially, we find reasonable grounds to support the Board's theory of agency. ILA does not attempt to dispute that the Japanese Unions acted at ILA's request as communicated by its representatives sent to Japan and in two subsequent letters. Further, the pressure by the Japanese Unions clearly was exerted on behalf of ILA. Mustering the finer distinctions of the law of agency, ILA first contends that there was no formal agency relationship because ILA had no right to control the actions of the Japanese Unions. Second, emphasizing that an agent performs a task in the principal's stead, ILA argues that, since it had no power to direct Japanese dockworkers to refuse to unload goods, it could not be a principal for purposes of delegating that power to the Japanese Unions. In the context of the NLRA, we find these arguments unpersuasive.

■ With regard to the first objection, ILA admittedly had no legal power to compel the Japanese Unions to assist in the dispute with Coastal and Canaveral. This lack of legal obligation, while perhaps dispositive in some theoretical suit between ILA and the Japanese Unions for breach of an agency agreement, does not allow ILA to avoid responsibility for violations of the NLRA conducted on its behalf and at its request. Several precedents involving employer and union responsibility for the un-

L.Ed.2d 318 (1981). *See also NLRB v. P\*I\*E Nationwide, Inc.*, 923 F.2d 506, 517–18 (7th Cir. 1991) (unlike the decision of a district court, the actions of an administrative agency cannot be sustained on a ground to which the agency made no reference; the agency's decision must stand or fall upon its express reasoning).

We uphold the injunction upon the agency theory proposed by the Board in its petition. Although the report adopted by the district court does not warmly embrace the Board's theory, the report incorporates enough of the Board's proposed findings and conclusions to

include the theory of agency. R1–24–19–20. Further, while we may not uphold the injunction on a ground not articulated by the Board, we are free to uphold the decision *of the district court* upon grounds not relied upon by that court. *See SEC v. Chenery Corp.*, 318 U.S. at 88, 63 S.Ct. at 459. We would be free to uphold the injunction upon the Board's agency theory even if the district court explicitly had rejected that theory. We note further that, in finding a reasonable basis to support the Board's theory, we rely solely upon the factual findings contained in the report adopted by the district court.

fair labor practices of another actor are instructive. The former Fifth Circuit held that where an employer encouraged the local Chamber of Commerce director to campaign against the formation of a union and failed to effectively disavow such interference, the employer was responsible for the director's conduct, despite the fact that the director was not the employer's formal agent. *Cagle's, Inc. v. NLRB*, 588 F.2d 943, 947–48 (5th Cir.1979). The court found that the employer had engaged in unfair labor practices despite the fact that the employer obviously had no more legal power to compel the director of the Chamber of Commerce to join the anti-union effort than ILA enjoyed over the Japanese Unions. Similarly, the NLRB found an employer responsible for the anti-union activities of a community organization where the employer encouraged the efforts of the organization and failed to rebut the statement in the propaganda distributed by the organization warning that the employer would close its manufacturing plant if a union was organized. *Star Kist Samoa, Inc.*, 237 N.L.R.B. 238 (1978). In that case the employer had no right to demand or control the actions of the community organization. Under the liberal application of agency concepts appropriate in the labor context, a contractual right to control and direct the performance of another is not required to impose responsibility under section 8(b) where an employer or union has encouraged or requested another to engage in unfair labor practices on its behalf.[4]

◼ The argument that ILA could not retain an agent to perform a task, i.e., directing Japanese dockworkers to refuse to unload cargo, which ILA had no authority to accomplish alone is similarly unper-

suasive. It is not clear that a principal must always be able to personally perform the task for which he or she retains an agent. For example, an attorney representing a corporation in federal court acts as an agent, despite the fact that the corporate entity would be forbidden to represent itself in such a proceeding.[5] Further, although routing its request via the Japanese Unions was perhaps the only *practical* means of ensuring that Japanese laborers refused to unload Florida citrus produce, it was clearly *possible* for ILA directly to request that the Japanese workers forbear, without the aid of the Japanese Unions as intermediaries. In *Cagle's Inc. v. NLRB*, the employer used the director of the local Chamber of Commerce as a vehicle to disseminate more effectively its anti-union message. Here, ILA selected the Japanese Unions to ferry its request. We decline to reject the Board's theory of agency simply because ILA selected a messenger more capable than itself. Based on applicable precedents, the Board has advanced a substantial and not frivolous legal theory upon which to assign responsibility to ILA for the conduct of the Japanese Unions.

## B.

◼ The ratification theory proposed by the Board also passes muster under the applicable standard of review. Even if the Japanese Unions did not act as agents when initially threatening to boycott fruit loaded in Florida by non-union workers, the subsequent conduct by ILA ratified the threatened boycott. This appears most clearly in the November letter in which ILA special consultant Lee, after acknowledging that the diversion of a Panamanian ship from Port Canaveral was the result of

---

**4.** We also find instructive the line of cases holding that, although members are not ordinarily agents of their union, a union may under certain circumstances be responsible for acts of its members based upon an awareness of the conduct and a failure to repudiate the acts. *See, e.g., Soft Drink Workers Union, Local No. 812*, 304 NLRB No. 22 (Aug. 19, 1991) (where union was aware of unfair labor practices by member on behalf of union and failed to repudiate the conduct, union was responsible for member's actions); *Service Employees Union, Local No. 87*, 291 NLRB 82 (1988) (picketers acted as

agents of union, based upon union's apparent endorsement and ratification, even absent evidence that union actually initiated or endorsed the picketing). Where, as here, the conduct violative of section 8(b) was actually requested by and performed on behalf of the union, the case for agency appears all the stronger.

**5.** *See Palazzo v. Gulf Oil Corp.*, 764 F.2d 1381, 1385–86 (11th Cir.1985), *cert. denied*, 474 U.S. 1058, 106 S.Ct. 799, 88 L.Ed.2d 775 (1986).

pressure by the Japanese Unions, *thanked* the Japanese Unions for this effort "on our behalf" and *requested* continued efforts of the same character. NLRB decisions clearly teach that where a union affirms prior conduct performed on its behalf, the union may be responsible for the unfair labor practices of another even where the conduct did not bind the union at the time it occurred. *See Service Employees Union, Local No. 87,* 291 NLRB 82 (1988). Even if, as argued by ILA, the Japanese Unions acted merely out of "the general antagonism of all labor unions to the use of non-union labor" (Appellant's Reply Br. 16), ILA was not free to use this unrest and resentment to restrain and coerce neutral entities in its dispute with Coastal and Canaveral. *See Sheet Metal Workers Union, Local No. 2,* 203 NLRB 954, 956 (1973) (even in absence of evidence that union induced walk off, union was liable if union official used *existing* worker unrest to coerce employer). Based upon ILA's expression of appreciation for the threatened boycott by the Japanese Unions and its request for a continued refusal to deal, we conclude that the Board has presented a substantial and not frivolous basis upon which to conclude that ILA ratified the conduct of the Japanese Unions.

### C.

▮ Finally, we find a reasonable basis to support the Board's "joint venture" theory. ILA argues that its relationship with the Japanese Unions lacks the elements of a formal joint venture, defined as (1) a community of interest in performance of a common purpose, (2) joint control or right of control, (3) a joint proprietary interest, and (4) a right to share in profits. Strict application of these elements, sensitively crafted in the commercial context, simply is not appropriate in the area of the NLRA. *See International Ass'n of Machinists,* 311 U.S. at 80, 61 S.Ct. at 88; *H.J. Heinz Co.,* 311 U.S. at 521, 61 S.Ct. at 323; *Local 1814, Int'l Longshoremen's Ass'n,* 735 F.2d at 1394. It appears that the NLRB will attribute responsibility based on a theory of joint venture or common cause where certain elements of the classic com-

mercial joint venture are at best weakly present. In *Bricklayers, Masons & Tile Setters, Local No. 20,* 174 NLRB 1251, 1251–2, 1259–63 (1969), the NLRB found that a trade council and its four constituent unions engaged in a "joint venture or common cause" to picket an employer. Although mere affiliation of the unions in a common trade council would not establish a joint venture, participation by agents of each union and a common design to pressure a single employer did support such a finding. 174 NLRB at 1260–63. Similarly in *Seattle District Council of Carpenters,* 114 NLRB 27, 29–30 (1955), four unions were held jointly and severally liable on a theory of joint venture where agents of each union acted to implement and further the effectiveness of picketing initiated by one union, all in pursuit of a common purpose.

Here ILA and the Japanese Unions engaged in a common enterprise designed to deter neutrals from employing non-union labor. ILA formulated the plan, requested the assistance of the Japanese Unions, and promised to supply information regarding ships destined to be unloaded by non-union labor. The Japanese Unions secured the participation of the dockworkers in Japan. Although, as argued by ILA, the Japanese Unions may have lacked any direct proprietary or financial interest in pressuring neutrals in the citrus export industry, there is no indication in NLRB precedents that participation motivated by labor solidarity would not sustain a finding of joint venture in the more liberal context of the NLRA. In short, the Board easily has articulated a substantial and not frivolous basis for attributing the conduct of Japanese Unions to ILA.

### D.

ILA argues that by attributing threats and coercion by the Japanese Unions to ILA, we render sections 8(b)(4)(i) and 8(b)(4)(ii) redundant. Section 8(b)(4)(i) prohibits a union from engaging in a strike or refusal (in the course of employment) which targets neutral entities or encourag-

ing or inducing another to do so. Section 8(b)(4)(ii) forbids a union to threaten, coerce, or restrain any person engaged in commerce. Here the Board proceeded exclusively under the second subsection, apparently based upon a belief that the Japanese Unions which were encouraged or induced by ILA were not "individual[s] employed by any person engaged in commerce" as required by section 8(b)(4)(i).

ILA points out that by holding a union which requests another to engage in coercive behavior vicariously liable under section 8(b)(4)(ii), there would be no need for section 8(b)(4)(i). The Board's interpretation, however, does not render this subsection superfluous since section 8(b)(4)(i) would reach the *unsuccessful* encouragement of another to engage in coercion or restraint, which would not fall under 8(b)(4)(ii). Further, the two sections inevitably overlap. For example, it is difficult to imagine a strike or refusal to deal in violation of subsection (i) which did not also threaten, coerce, or restrain as forbidden by subsection (ii). In interpreting the NLRA, other circuits have noted that the same conduct by an employer or union may at once satisfy the requirements of several subsections.[6] Even if we were to accept each premise offered on this point by ILA, the risk of rendering these subsections somewhat more redundant would not warrant holding the Board's legal theory unsubstantial or frivolous at this stage in the proceeding. ILA has not suggested any way in which we would frustrate Congress' intent in enacting section 8(b) by upholding the Board's theory. Instead, the ILA's interpretation would allow a union to escape responsibility for actions which ILA concedes would constitute a classic secondary boycott if the Japanese Unions had been "person[s] in commerce." We believe that the statutory purpose is best vindicated by the Board's interpretation.

## IV.

Having more precisely described ILA's responsibility for the threatened secondary boycott, we consider whether the conduct alleged in the Board's petition falls within the scope of the NLRA. ILA contends that, even if the actions of the Japanese Unions could be attributed to ILA, these acts occurred outside the geographic territory of the United States and therefore beyond the intended application of the NLRA. ILA directs our attention to the recent decision of the Supreme Court in *EEOC v. Arabian American Oil Co.*, —— U.S. ——, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) and to a line of cases founded on *Benz v. Compania Naviera Hidalgo, S.A.*, 353 U.S. 138, 77 S.Ct. 699, 1 L.Ed.2d 709 (1957) limiting the application of the NLRA.

### A.

In *EEOC v. Arabian American Oil*, the Supreme Court held that Title VII does not protect an American citizen employed and terminated in Saudi Arabia by an American employer. —— U.S. at ——, 111 S.Ct. at 1229. Conceding that Congress has the authority to enforce its laws beyond the territorial boundaries of the United States, the Court considered whether Congress intended Title VII to apply in these circumstances in light of the "long-standing principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" —— U.S. at ——, 111 S.Ct. at 1230 (quoting *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285, 69 S.Ct. 575, 577, 93 L.Ed. 680 (1949)). The Court held that Title VII focuses purely upon domestic employment relationships and that the struc-

---

**6.** See *Local Union No. 277, Int'l Brotherhood of Painters v. NLRB*, 717 F.2d 805, 808 (3rd Cir. 1983) ("A finding that a union provoked or attempted to provoke discrimination in violation of section 8(b)(2) is usually accompanied by a finding that the same conduct constituted coercion in violation of section 8(b)(1)(A)."); *Indiana & Mich. Elec. Co. v. NLRB*, 599 F.2d 227, 229 n. 2 (7th Cir.1979) ("A violation of § 8(a)(1) [forbidding employer discrimination against an employee's union activities] constitutes a derivative violation of § 8(a)(3) [forbidding coercion or interference with rights of employees] when ... the employer's acts served to discourage union membership or activities.").

ture of the statute did not suggest that Congress intended to regulate the termination of an American citizen by an American employer where the employee worked and was discharged in Saudi Arabia. — U.S. at ——, 111 S.Ct. at 1229.

The Supreme Court has held that the NLRA does not regulate the practices of owners of foreign vessels which are temporarily present in an American port with regard to foreign employees working on these vessels. *McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963). Further, the NLRA does not encompass picketing by an American labor union at an American port where such picketing is aimed at altering the employment relationship between owners of foreign vessels and foreign seamen. *American Radio Ass'n v. Mobile S.S. Ass'n, Inc.*, 419 U.S. 215, 95 S.Ct. 409, 42 L.Ed.2d 399 (1974); *Windward Shipping (London), Ltd. v. American Radio Ass'n*, 415 U.S. 104, 94 S.Ct. 959, 39 L.Ed.2d 195 (1974); *Benz v. Compania Naviera Hidalgo, S.A.*, 353 U.S. at 142–46, 77 S.Ct. at 702–04.

ILA argues that the presumption against the extraterritorial application of statutes affirmed in *EEOC v. Arabian American Oil*, coupled with the cases in the *Benz* and *McCulloch* line, dictate that the conduct described in the Board's petition for injunction is not regulated by the NLRA. ILA would have us hold that conduct occurring outside the geographic boundaries of the United States may not be reached by the NLRA, without regard to the origin of the actors or the intent or effect of the conduct. We do not believe that either *EEOC v. Arabian American Oil* or the *Benz* line of cases dictate such an unsophisticated test. We conclude that the NLRA reaches the conduct of an American union which solicits a foreign entity to apply pressure overseas with the intent and effect of gaining an unlawful advantage in a primary

labor dispute in the United States by coercing American employers.

In *Benz* and the subsequent cases named above, the Court did not restrict the scope of the NLRA to conduct which occurs within the geographic boundaries of the United States. To the contrary, each of these cases dealt either with employment relations upon a foreign vessel docked at an *American* port or the picketing activity of a domestic labor union *in the United States.* In each case, despite the fact that the conduct at issue was well within the geographic reach of American law, the Court held that the NLRA was not intended to apply. The *Benz* cases do not represent generally applicable boundaries of commerce, but instead a judgment that Congress did not intend to interfere with the internal operation of foreign vessels. As the Court explained in *Windward Shipping:*

> The term "in commerce," as used in the LMRA, is obviously not self-defining, and certainly the activities in *Benz, McCulloch,* and *Incres [S.S. Co. v. International Maritime Workers Union,* 372 U.S. 24, 83 S.Ct. 611, 9 L.Ed.2d 557 (1963) ], held not covered by the Act, were literally just as much "in commerce" as were the activities held covered in [*International Longshoremen's Ass'n, Local 1416 v. Ariadne Shipping Co.,* 397 U.S. 195, 90 S.Ct. 872, 25 L.Ed.2d 218 (1970) ]. Those cases which deny jurisdiction to the NLRB recognize that Congress, when it used the words "in commerce" in the LMRA, simply did not intend that Act to erase longstanding principles of comity and accommodation in international maritime trade.

415 U.S. at 112–13, 94 S.Ct. at 964.[7] *International Longshoremen's Ass'n v. Allied Int'l, Inc.*, 456 U.S. 212, 102 S.Ct. 1656, 72 L.Ed.2d 21 (1982) provided the Court with another opportunity to amplify *Benz* and *McCulloch.* The Court held that ILA's refusal to unload cargo shipped from the

---

**7.** In *Windward Shipping,* the Court held that picketing against a foreign employer of foreign workers was not included in the NLRA on the grounds that "[v]irtually none of the predictable responses of a foreign shipowner to picketing of

this type ... would be limited to the sort of wage-cost decision benefiting American workingmen which the LMRA was designed to regulate." 415 U.S. at 115, 94 S.Ct. at 965.

Soviet Union in protest of the Afghanistan invasion violated the secondary boycott provisions of the NLRA. 456 U.S. at 222–26, 102 S.Ct. at 1662–64.

> Unlike the situation in every case from *Benz* through *Mobile*, the ILA's refusal to unload Allied's shipments in no way affected the maritime operations of foreign ships. The boycott here did not aim at altering the terms of employment of foreign crews on foreign-flag vessels. It did not seek to extend the bill of rights developed for American workers and American employers to foreign seamen and foreign shipowners. The longstanding tradition of restraint in applying the laws of this country to ships of a foreign country—a tradition that lies at the heart of *Benz* and every subsequent decision—therefore is irrelevant to this case.

456 U.S. at 221, 102 S.Ct. at 1662. Most recently, in *EEOC v. Arabian American Oil,* the Court confirmed that the presumption against extraterritorial application is in fact a presumption that Congress intended to avoid "clashes between our laws and those of other nations which could result in international discord." —— U.S. at ——, 111 S.Ct. at 1230.

### B.

██ Guided by these precedents, we hold that the alleged violation of section 8(b)(4)(ii) by ILA falls within the scope of the NLRA. Specifically, the Board's exercise of jurisdiction is supported by several factors: (1) the NLRA is here applied, as Congress intended, to protect persons in commerce from a secondary boycott, (2) the conduct was intended and had the effect of creating an unlawful secondary boycott in the United States, (3) certain significant conduct in furtherance of the secondary boycott occurred within the geographic territory of the United States, and (4) the fact that the Board is acting against a domestic labor organization subject to regulation under the NLRA.

Although the NLRA was not intended to regulate the relationship between foreign seamen and the owners of foreign vessels, section 8(b)(4) was designed to limit the scope of primary labor disputes and to shield "unoffending employers and others from pressure in controversies not their own." *NLRB v. Denver Bldg. & Constr. Trades Council,* 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284 (1951). The protection of neutral entities such as the Canaveral Port Authority, which received a tariff on vessels loaded by Canaveral, as well as the exporters who did business with Canaveral and Coastal falls squarely within the purposes of the NLRA.[8] Further, foreign corporations, such as the shippers and importers involved in the Florida citrus trade, who do business in the United States are "within commerce" for the purposes of enjoying the protection against secondary boycotts in section 8(b)(4).[9] This case thus

---

**8.** Although the Japanese Unions may not have directly communicated their threats to the domestic exporters and shippers operating from Florida, these entities were threatened, coerced, or restrained within the meaning of section 8(b)(4). The NLRB has held that all neutrals affected by a union's announced course of conduct are threatened within section 8(b)(4) even though the union does not directly communicate the threat to a particular neutral. In *International Longshoremen's Ass'n (Kansas Farm Bureau),* 264 NLRB 404, 407–08 (1982), *enforced, International Longshoremen's Ass'n v. NLRB,* 723 F.2d 963 (D.C.Cir.1983), the union induced employees of a neutral stevedoring company to refuse to load goods for export to the Soviet Union. Although the only direct communication by the union was in the form of a policy statement to its members and local affiliates, this conduct was found to threaten,

within the meaning of section 8(b)(4)(ii), the stevedoring companies, an American shipping agency which contracted with the Soviet Union, and a vessel commissioned by the U.S.S.R. to transport the boycotted grain. 264 NLRB at 407–08. The Board reasoned that the union "must have foreseen that neutral employers such as [the shipping] Agencies, Stevedores, and the *Belgium* would be forced to cease doing business with [the Soviet chartering corporation] and Cargill [an American grain exporter], and with each other." *Id. See also Tri–State Bldg. & Constr. Trades Council (Backman Sheet Metal),* 272 NLRB 8, 8 n. 1, (1984), *aff'd, International Brotherhood of Boilermakers, Local No. 105 v. NLRB,* 781 F.2d 569 (6th Cir.1986).

**9.** *See International Longshoremen's Ass'n, Local No. 1414 (Occidental Chemical Corp.),* 261 NLRB 1, 4 (1982), *enforced mem., International*

contrasts sharply with *McCulloch,* in which the Court considered the jurisdiction of the Board to order an election among foreign seamen employed aboard a Honduran ship. There the Court, emphasizing that the NLRA was enacted as "a bill of rights both for *American* workingmen and for their employers," held that the NLRA did not contemplate the internal management and affairs of foreign vessels. 372 U.S. at 20; 83 S.Ct. at 677. Here we are confronted with the Board's application of section 8(b)(4) on behalf of the very parties which Congress intended to protect. Further, the present action does not involve the prospect of interfering with the internal operation of foreign vessels or offending in any fashion the principles of international comity which guided the Court in *Benz* and its progeny.[10]

Since the object and effect of the conduct in question was to implement a secondary

boycott within the United States, we do not believe the location of that conduct is determinative. Where the object of the unlawful threats and coercion is to gain an advantage in a domestic labor dispute by pressuring neutrals which are protected under the NLRA, the fact that the principal threats by the Japanese Unions were uttered overseas is of little significance. By analogy, where an agreement to restrain trade and a majority of furthering acts occur outside the United States, the Sherman Act will nonetheless reach the conspiracy, provided that the conduct is intended to and results in substantial effects within the United States.[11] Other circuits have confirmed the application of the Commodity Exchange Act[12] and the Securities and Exchange Act[13] to conduct occurring outside the United States which causes foreseeable and substantial effects within the

*Longshoremen's Ass'n v. NLRB,* 702 F.2d 1205 (D.C.Cir.1983); *International Longshoremen's Assoc. (Kansas Farm Bureau),* 264 NLRB at 406. *See also State Bank of India v. NLRB,* 808 F.2d 526, 531–34 (7th Cir.1986), *cert. denied,* 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987).

**10.** We do not suggest that under these facts the Board would have jurisdiction over the Japanese Unions involved in the secondary boycott. The Board has not attempted any action against these foreign labor organizations and, therefore, this question is not before us. Nor does the prospect of drawing such organizations within the ambit of the NLRA deter us from upholding this exercise of jurisdiction over ILA. First, the Board has tailored its decisions to avoid undue interference in the internal affairs of foreign entities. *See, e.g., GTE Automatic Electric, Inc.,* 226 NLRB 1222 (1976) (no jurisdiction over American employer of American employees where employer was doing business in Iran); *RCA OMS, Inc. (Greenland),* 202 NLRB 228, 228 (1973) (no jurisdiction over Danish employer doing business in Greenland where employees, although hired in United States, worked exclusively in Greenland where controversy arose). More importantly, we suspect that the principle which guided the Court in *Benz* and *McCulloch* would be a sufficient hedge against applications of the NLRA which risk undue intrusion into another nation's internal affairs. As interpreted in *Windward Shipping,* these cases teach that conduct which is otherwise "in commerce" may

be removed from the scope of the NLRA to respect "longstanding principles of comity and accommodation in international maritime trade." 415 U.S. at 112–13, 94 S.Ct. at 964. We therefore see no need to artificially constrict the scope of the NLRA over the conduct of an American labor organization.

**11.** *In re Insurance Antitrust Litigation,* 938 F.2d 919, 931–34 (9th Cir.1991), *petition for cert. filed* (Jan. 9, 1992), *and petition for cert. filed* (Jan. 10, 1992), *and petition for cert. filed* (Jan. 13, 1992); *Laker Airways Ltd. v. Sabena Belgian World Airlines,* 731 F.2d 909, 925 (D.C.Cir.1984).

**12.** In *Tamari v. Bache & Co. (Lebanon) S.A.L.,* 730 F.2d 1103 (7th Cir.), *cert. denied,* 469 U.S. 871, 105 S.Ct. 221, 83 L.Ed.2d 151 (1984), the Seventh Circuit sustained jurisdiction over a dispute between nonresident aliens trading on United States exchanges even though all of the contacts between the parties, including the unlawful solicitation and misrepresentation by the trader occurred in Lebanon. The court specifically upheld the exercise of jurisdiction under the "effects test" for transnational disputes under which United States courts may reach conduct occurring in foreign countries which has foreseeable and substantial effect in this country. 730 F.2d at 1107–08.

**13.** *See Alfadda v. Fenn,* 935 F.2d 475, 478 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 638, 116 L.Ed.2d 656 (1991); *Bersch v. Drexel Fire-*

United States. The intent and result of the conduct described in the Board's petition clearly was to effect a secondary boycott in the United States; therefore, ILA's conduct falls within the scope of the NLRA.[14]

Moreover, significant actions taken in this country by ILA support the Board's jurisdiction. Although the initial meeting between ILA representatives and those of the Japanese Unions occurred in Japan, ILA repeated and affirmed its request in the October letter mailed from New York. Further, ILA ratified the actions of the Japanese Unions in the November letter mailed from Washington, D.C. Therefore, some of the actions upon which ILA's liability is based occurred within the United States, and the NLRA is properly invoked to reach such conduct.

Finally, we consider it appropriate that the NLRA is here applied to regulate the conduct of a domestic labor organization operating in the United States. ILA may not immunize its unfair labor practices by the simple device of selecting a foreign intermediary or by confining its coercion and threats to those participants in the flow of commerce between the United States and Japan who happen to reside in the latter country.

V.

We hold that the Board has presented a substantial and not frivolous basis upon which to attribute the conduct of the Japanese Unions to ILA. If this was a dispute between private parties sounding in tort or contract, certain of the elements required to find an agency or joint venture relationship might well be lacking. In the more

liberal concept of agency appropriate to the NLRA, however, ILA is accountable for the actions of the Japanese Unions.

The conduct described in the Board's petition is within the scope of the NLRA. Although the Supreme Court has limited the scope of the NLRA to avoid interference with the internal affairs of other nations, the Act is properly applied to the conduct of a domestic labor union which solicits a foreign union to apply pressure overseas with the intent and result of creating a secondary boycott in the United States. Further, the conduct charged in the Board's petition is not wholly extraterritorial; the letters requesting and ratifying the boycott threatened by the Japanese Unions were sent from the United States. Under these circumstances, nothing in the text or intent of the NLRA compels us to allow ILA to evade responsibility for effecting a successful secondary boycott in violation of the NLRA. We find that the Board articulated a substantial legal and factual basis for a finding that unfair labor practices had been committed. We AFFIRM the imposition of a temporary injunction.

stone, Inc., 519 F.2d 974, 993 (2d Cir.), cert. denied, 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975). See also Continental Grain (Australia) Pty. Ltd. v. Pacific Oilseeds, Inc., 592 F.2d 409, 416–17 & n. 12 (8th Cir.1979) and cases cited therein.

14. The Supreme Court has not ignored the effects of union conduct in its jurisdictional analysis of the NLRA. In International Longshoremen's Ass'n v. Allied Int'l, Inc., the Court noted that NLRB jurisdiction over an ILA boycott of goods bound for the U.S.S.R. was supported by the effect of the boycott upon national policy regarding exports to the Soviet Union. 456 U.S. at 221 n. 17, 102 S.Ct. at 1662 n. 17.