LIU, J., Concurring.
I join the court’s opinion and write separately to provide additional context in support of the conclusion that the two statutory provisions at issue in this case—Code of Civil Procedure section 527.3 (the Moscone Act) and Labor Code section 1138.1 (section 1138.1)—do not violate the First or Fourteenth Amendments to the United States Constitution. I also briefly discuss the scope of labor activity protected by the Moscone Act in response to the separate opinions of the Chief Justice and Justice Chin.
I.
In challenging the constitutionality of the Moscone Act and section 1138.1, Ralphs Grocery Company (Ralphs) does not and cannot argue that its own freedom of speech is burdened. Rather, it seeks to assert the First Amendment rights of hypothetical third party speakers who might like to speak on Ralphs’s private property but whose right to do so is not protected by the Moscone Act or section 1138.1. But invalidating those statutes would have no effect on the ability of such hypothetical third parties to speak; Ralphs may eject such speakers from its property under state trespass law whether or not the Moscone Act or section 1138.1 remains on the books. (See maj. opn., ante, at p. 1101 [“invalidating ... the Moscone Act and section 1138.1 would not remove any restrictions on speech or enhance any opportunities for peaceful picketing or protest. . .”].)
The crux of Ralphs’s First Amendment claim is not an improper denial of speech to anyone, but rather an allegation of content-based discrimination. As Justice Chin notes, the Moscone Act and section 1138.1 secure for “labor *1109 picketers, but no one else, ... the right to engage in speech activities on [Ralphs’s] property.” (Conc. & dis. opn. of Chin, 1, post, at p. 1122.) The surface appeal of this account of what the statutes do must be considered in the broader context of the statutes’ historical origins. As explained below, the Legislature enacted these statutes in order to restrain the role of courts in labor disputes and to promote dispute resolution through collective bargaining, not to burden nonlabor speech or to express favoritism for labor speech over other speech. So understood, the statutes are no different from a broad range of labor, employment, and economic regulations that arguably impinge on speech but pose no serious First Amendment concern.
A.
As today’s opinion notes (maj. opn., ante, at pp. 1093-1094), the Moscone Act and section 1138.1 are almost identical to the corresponding provisions of the federal Norris-LaGuardia Act, 29 U.S.C. § 101 et seq. One of Congress’s primary goals in enacting the Norris-LaGuardia Act in 1932 was to address the overuse of injunctions in labor disputes. (See Koretz, Statutory History of the United States Labor Organization (1970) pp. 162-257 (Koretz); Frankfurter & Greene, The Labor Injunction (1930) pp. 199-228 (Frankfurter & Greene).) One scholar estimates that federal and state courts issued at least 4,300 injunctions against labor protestors between 1880 and 1930. (Forbath, The Shaping of the American Labor Movement (1989) 102 Harv. L.Rev. 1111, 1151 (Forbath).) About 2,100 of these injunctions were issued during the 1920s alone, bringing the proportion of strikes met by injunctions to a high of 25 percent. (Id. at p. 1227.) As employers made increasing use of this tool to nip labor disputes in the bud, the labor injunction “assumed new and vast significance in [the] national economy.” (Frankfurter & Greene, supra, at p. 24.)
Many contemporary scholars and legislators were critical of this development. They observed that labor injunctions were often unnecessary and overbroad; many of the activities enjoined were punishable independently as crimes or torts, and “[t]he blanket wording of numerous [injunctions] frequently include[d] the residuum of conduct even remotely calculated to have effect in the dispute, but neither criminal nor tortious.” (Frankfurter & Greene, supra, at p. 105.) Resort to injunctions meant that juries had no role in checking the exercise of judicial power. (See Forbath, supra, 102 Harv. L.Rev. at p. 1180 [“the ‘doing away’ with juries was one of the chief attractions of equity over criminal law from the employer’s perspective”].) In addition, injunctions were frequently issued ex parte, without notice, and upon an inadequate evidentiary foundation. (See Frankfurter & Greene, supra, at p. 200 [courts issued “[temporary injunctive relief without notice . . . upon dubious affidavits”]; id. at p. 106 [the language of injunctions was often “stereotyped and transferred verbatim *1110 from case to case, without considered application by the court to the peculiar facts of each controversy”]; Sen.Rep. No. 163, 72d Cong., 1st Sess., p. 8 (1932) [Rep. of U.S. Sen. Com. on Judiciary, on Sen. Bill No. 935: “[B]efore [the protestor] is given an opportunity to be heard, he is enjoined.”], reprinted in Koretz, supra, at p. 172 (hereafter Senate Judiciary Report).)
Employers’ reliance on injunctions was particularly subject to abuse, the critics argued, because the injunctions could not preserve the status quo and suspended only the activities of the strikers: “[T]he suspension of strike activities, even temporarily, [could] defeat the strike for practical purposes and foredoom its resumption, even if the injunction [was] later lifted,” and “improvident issue of the injunction [could] be irreparable to the defendant.” (Frankfurter & Greene, supra, at p. 201.) Labor injunctions were also “invoked by employers, police, and the press to justify measures like arming strikebreakers or jailing pickets.” (Forbath, supra, 102 Harv. L.Rev. at p. 1187.)
The abuse and overuse of injunctive decrees presented serious risks for the judiciary. Organized labor complained that courts were improperly engaged in “government by injunction.” (Koretz, supra, at p. 162 [“For nearly half a century organized labor battled against what it called ‘government by injunction.’ ”]; Frankfurter & Greene, supra, at p. 200 [“[T]hose zealous for the unimpaired prestige of our courts have observed how the administration of law by decrees which through vast and vague phrases surmount law, undermines the esteem of courts upon which our reign of law depends. Not government, but ‘government by injunction,’ characterized by the consequences of a criminal prosecution without its safeguards, has been challenged.”].) The threat to judicial prestige and legitimacy was a major concern motivating Congress’s enactment of the Norris-LaGuardia Act. (See Marine Cooks v. Panama S. S. Co. (1960) 362 U.S. 365, 369, fn. 7 [4 L.Ed.2d 797, 80 S.Ct. 779] [Congress’s purpose was “to protect the rights of laboring men to organize and bargain collectively and to withdraw federal courts from a type of controversy for which many believed they were ill-suited and from participation in which, it was feared, judicial prestige might suffer”]; Sen. Judiciary Rep., supra, at p. 25, reprinted in Koretz, supra, at pp. 192-193 [“The main purpose of these definitions is to provide for limiting the injunctive powers of the Federal courts only in the special type of cases, commonly called labor disputes, in which these powers have been notoriously extended beyond the mere exercise of civil authority and wherein the courts have been converted into policing agencies devoted in the guise of preserving the peace, to the purpose of aiding employers to coerce employees into accepting terms and conditions of employment desired by employers.”].) Indeed, the Senate Judiciary Committee warned that the power to make law through injunction, combined with the power to enforce that law through *1111 findings of contempt, would result in “judicial tyranny.” (Sen. Judiciary Rep., supra, at p. 18, reprinted in Koretz, supra, at p. 184.)
In response to these concerns, Senator Shipstead introduced a bill on December 12, 1927, proposing to limit federal courts’ jurisdiction over labor disputes. (Sen. Judiciary Rep., supra, at p. 2, reprinted in Koretz, supra, at p. 169.) Congress held extensive hearings on the subject, some “upon application of attorneys representing corporations and organizations opposed to the enactment” of the legislation (Sen. Judiciary Rep., at p. 3, reprinted in Koretz, supra, at p. 170), and various versions of the bill were vigorously debated. (See Koretz,. supra, at pp. 240, 242 [Remarks of Rep. Beck, Debate on H.R. No. 5315, 72d Cong., 1st Sess. (1932), arguing that the proposed bill “[would] do infinite harm to both classes, employer and employee, and . . . the innocent public,” and criticizing the bill for taking “no account whatever of the motives and purposes with which a nation-wide strike or boycott can be commenced and prosecuted”]; Sen. Judiciary Rep., supra, at p. 4, reprinted in Koretz, supra, at pp. 170-171 [noting that several versions of the bill were given “adverse report[s]” by the Senate subcommittee]).
But the proposed legislation steadily gained in popularity. The House Judiciary Committee noted that “[h]earings . . . held by congressional committees over a period of years and the facts adduced [had] brought about an almost unanimity of opinion that such powers of the Federal courts [had] been exercised to the detriment of the public welfare and [needed to] be curbed.” (H.R. Rep. No. 669, 72d Cong., 1st Sess., p.- 2 (1932) [Rep. of U.S. House Com. on Judiciary on H.R. No. 5315], reprinted in Koretz, supra, at p. 193.) In 1931, both political parties promised legislative reforms in their platforms. (Koretz, supra, at p. 172.) The proposed legislation ultimately passed by a vote of 363 to 13 in the House and 75 to 5 in the Senate. (Id. at p. 162.) As enacted, the Norris-LaGuardia Act reaffirmed that certain acts of labor organizations were lawful (29 U.S.C § 104) and divested federal courts of their equitable power to enjoin labor disputes except under certain limited circumstances and after following specified procedures (29 U.S.C. § 107).
The Norris-LaGuardia Act limits only the power of federal courts to issue injunctions. After its enactment, many state legislatures passed “ ‘little Norris-LaGuardia Act[s]’ ” to place similar restraints on the injunctive powers of state courts. (Messner v. Journeymen Barbers etc. International Union (1960) 53 Cal.2d 873, 898, fn. 4 [4 Cal.Rptr. 179, 351 P.2d 347] (dis. opn. of Schauer, J.).) California’s Moscone Act was one such law. “The original bill, drafted by union attorneys, clearly sought to limit the injunctive jurisdiction of the superior court. The act declared its purpose expressly: to prevent ‘the evils which frequently occur when courts interfere with the normal processes of dispute resolution between employers and recognized employee organizations.’ ” (Sears, Roebuck & Co. v. San Diego County Dist. Council of *1112 Carpenters (1979) 25 Cal.3d 317, 323 [158 Cal.Rptr. 370, 599 P.2d 676] (Sears), quoting Code Civ. Proc., § 527.3, subd. (a).)
As we noted in Sears, “[t]he preamble to the Moscone Act identifies the procedural inequities which occur when the courts issue injunctions in labor disputes. It states: [][]... [][] ‘Equity procedure that permits a complaining party to obtain sweeping injunctive relief that is not preceded by or conditioned upon notice to and hearing of the responding party or parties, or that issues after hearing based upon written affidavits alone and not wholly or in part upon examination, confrontation and cross-examination of witnesses in open court, is peculiarly subject to abuse in labor litigation for each of the following reasons: [][] (a) The status quo cannot be maintained, but is necessarily altered by the injunction, [f] (b) The determination of issues of veracity and of probability of fact from the affidavits of the opposing parties which are contradictory and, under the circumstances, untrustworthy rather than from oral examination in open court, is subject to grave error, [f] (c) The error in issuing the injunctive relief is usually irreparable to the opposing party. [][] (d) The delay incident to the normal course of appellate procedure frequently makes ultimate correction of error in law or in fact unavailing in the particular case.’ (Stats. 1975, ch. 1156, § 1, p. 2845.)” (Sears, supra, 25 Cal.3d at pp. 323-324, fn. 2.)
As ultimately enacted in 1975, the Moscone Act “established] the legality of certain labor practices and limit[ed] the equity jurisdiction of the superior court to enjoin such practices.” (Sears, supra, 25 Cal.3d at p. 322.) The statute’s text is written expressly as a restraint on courts. Subdivision (a) provides that “the equity jurisdiction of the courts in cases involving or growing out of a labor dispute shall be no broader than as set forth in subdivision (b) of this section, and the provisions of subdivision (b) of this section shall be strictly construed in accordance with existing law governing labor disputes with the purpose of avoiding any unnecessary judicial interference in labor disputes.” (Code Civ. Proc., § 527.3, subd. (a).) Subdivision (b) provides: “The acts enumerated in this subdivision, whether performed singly or in concert, shall be legal, and no court nor any judge nor judges thereof, shall have jurisdiction to issue any restraining order or preliminary or permanent injunction which, in specific or general terms, prohibits any person or persons, whether singly or in concert, from doing any of the following: [][] (1) Giving publicity to, and obtaining or communicating information regarding the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling any public street or any place where any person or persons may lawfully be, or by any other method not involving fraud, violence or breach of the peace. [][] (2) Peaceful picketing or patrolling involving any labor dispute, whether engaged in singly or in numbers, [f] (3) Assembling peaceably to do any of the acts specified in paragraphs (1) and (2) or to promote lawful interests.” (Id., § 527.3, subd. (b).)
*1113 Fifteen years later, the Legislature enacted section 1138.1, which codified the procedures that must be followed before an injunction will issue. The court must find, among other things, that “unlawful acts have been threatened and will be committed unless restrained . . .”; that “substantial and irreparable injury to complainant’s property will follow” in the absence of an injunction; and that “the public officers charged with the duty to protect complainant’s property are unable or unwilling to furnish adequate protection.” (§ 1138.1, subd. (a).)
Importantly, the statutory restraints on labor injunctions do not leave employers without a remedy for unlawful activity. Indeed, section 1138.1, subdivision (a)(5) requires the employer to show that “the public officers charged with the duty to protect complainant’s property are unable or unwilling to furnish adequate protection.” The existence of this requirement implies that the police are authorized to stop any “unlawful acts” proscribed by the Moscone Act. (See United Food & Commercial Workers Union v. Superior Court (2000) 83 Cal.App.4th 566, 578 [99 Cal.Rptr.2d 849] [29 U.S.C. § 107, from which § 1138.1 was patterned almost verbatim, “ ‘was based upon a recognition of the fact that the preservation of order and the protection of property in labor disputes is in the first instance a police problem’ ”].) In addition, if labor protestors are engaged in unlawful activity that causes the store to lose money, the employer may sue for damages. Section 1138.1 simply limits one form of relief available to the employer based on the Legislature’s judgment that court-issued injunctions are a poor method of resolving labor disputes.
In sum, the Moscone Act and section 1138.1, like the federal statute they emulate, were enacted to remedy judicial practices that unfairly proscribed labor speech, not to favor labor speech over other types of expressive conduct.
B.
In its brief, Ralphs contends that the statutes violate the principle of content neutrality because they “discriminate in favor of labor speech by exalting labor over all other types of expressive activities.” (See Waremart Foods v. NLRB (D.C. Cir. 2004) 359 U.S. App.D.C. 312 [354 F.3d 870, 874—875].) But even if this were a proper characterization of the statutes, it is hardly obvious that they run afoul of the First Amendment. The principal cases on which Ralphs relies—Police Department of Chicago v. Mosley (1972) 408 U.S. 92 [33 L.Ed.2d 212, 92 S.Ct. 2286] and Carey v. Brown (1980) 447 U.S. 455 [65 L.Ed.2d 263, 100 S.Ct. 2286]—involved content-based prohibitions on speech in quintessential public forums. Outside the context of a public forum, the principle of content neutrality, though “frequently . . . identified as the First Amendment’s operative core, is neither so *1114 pervasive nor so unyielding as is often thought.” (Fallon, Sexual Harassment, Content Neutrality, and the First Amendment Dog That Didn’t Bark, 1994 Sup. Ct. Rev. 1, 2 (Fallon).) Because “large areas of communication still remain untouched by the First Amendment,” the principles governing the First Amendment’s applicability to speech regulation cannot be reduced to any simple formula. (Schauer, The Boundaries of the First Amendment: A Preliminary Exploration of Constitutional Salience (2004) 117 Harv. L.Rev. 1765, 1800-1801 (Schauer) [“the explanation for what is ultimately treated as covered by the First Amendment and what ultimately remains uncovered appears to be the result of a highly complex array of factors, some of which are doctrinal but many of which are not”].)
To begin with, the “Supreme Court has explicitly recognized several categories [of speech] within which content-based regulation is sometimes permitted, often on a relatively ad hoc basis,” including commercial speech, adult speech, libel, broadcast media, speech of government employees, and student speech. (Fallon, supra, 1994 Sup. Ct. Rev. at p. 23; see id. at pp. 23-26.) The high court has further held that some categories of speech, defined on the basis of content, are of such low value that they do not merit First Amendment protection. (Fallon, at p. 23 [“[o]bscenity, fighting words, and child pornography are well-known examples of generally unprotected categories”].)
Moreover, many laws that regulate speech based on its content have never been thought to trigger First Amendment concern. For example, the Securities and Exchange Commission “engages in pervasive content-based control over speech” in regulating securities: it prohibits companies from making offers and advertisements without advance approval, regulates the statements candidates may make in proxy contests, and prohibits the transmission of accurate inside information from “tipper” to “tippee” in the insider trading context. (Schauer, supra, 117 Harv. L.Rev. at pp. 1778-1779.) Similarly, “antitrust law restricts the exchange of accurate market, pricing, and production information, as well as limits the advocacy of concerted action in most contexts; yet it remains almost wholly untouched by the First Amendment.” (Id. at p. 1781, fns. omitted.) “[M]uch the same degree of First Amendment irrelevance holds true for the content-based regulation of trademarks, the pervasive and constitutionally untouched law of fraud, almost all of the regulation of professionals, virtually the entirety of the law of evidence, large segments of tort law, and that vast domain of criminal law that deals with conspiracy and criminal solicitation.” (Id. at pp. 1783-1784, fns. omitted.) Nor does it violate the First Amendment for government to impose greater punishment for crimes in which the defendant selected the victim because of the victim’s race or other protected status. (Wisconsin v. Mitchell (1993) 508 U.S. 476, 487 [124 L.Ed.2d 436, 113 S.Ct. 2194] [holding that penalty enhancement statute “is aimed at conduct unprotected by the First Amendment”]; In re M.S. (1995) 10 Cal.4th *1115 698, 720-726 [42 Cal.Rptr.2d 355, 896 P.2d 1365] [upholding hate crimes statute against First Amendment claim alleging content-based discrimination].
Scholars surveying this legal landscape have struggled to develop a coherent theory that explains why some regulations impinging on speech trigger First Amendment concern while others do not. Professor Schauer interprets the case law to suggest that the state may criminalize “speech [that] is face-to-face; informational, particular, and for private gain,” but not speech that is “public, noninformational, and ideological [in] nature.” (Schauer, supra, 111 Harv. L.Rev. at pp. 1801, 1802.) Further, he posits that the First Amendment’s coverage in the civil context may be partly explained by the existence or absence of a sympathetic class of litigants or a well-entrenched regulatory scheme. (Schauer, at pp. 1803-1807.) Whatever the merits of these views, it is apparent that “the conceptual space covered by the First Amendment is [simply] too vast to yield to a general rule of content neutrality, a categorical prohibition of ad hoc balancing, or any other single formulation.” (Fallon, supra, 1994 Sup. Ct. Rev. at p. 22.)
Most pertinent to the case before us, the Supreme Court has consistently rejected First Amendment challenges to content-based speech regulations in the context of labor relations. As today’s opinion explains, content-based protections for labor-related speech in private workplaces pervade the federal National Labor Relations Act (NLRA). (Maj. opn., ante, at pp. 1102-1104.) Under 29 United States Code section 158(a)(1), it is unlawful for an employer to interfere with employees’ rights to form or join a union, and “this provision has long been construed to protect an employee’s right to speak ■ for or against a union on the employer’s premises, even though the employer may prohibit solicitations on other topics.” (Maj. opn., ante, at p. 1102, citing Republic Aviation Corp. v. Board (1945) 324 U.S. 793 [89 L.Ed. 1372, 65 S.Ct. 982].) The NLRA also protects the right of employers to speak on unionization by providing that “[t]he expressing of any views, argument, or opinion, or the dissemination thereof . . . shall not constitute or be evidence of an unfair labor practice ... if such expression contains no threat of reprisal or force or promise of benefit.” (29 U.S.C. § 158(c); see Lab. Code, § 1155 [almost identical language applicable to agricultural employers].)
Similarly, content-based prohibitions on labor-related speech pervade federal and state labor laws. The NLRA makes it unlawful for a union or its agents to engage in speech that “restraints] or coerce[s]” employees in their decision to unionize or bargain collectively (29 U.S.C. § 158(b)(1)); “to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a *1116 strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services” (id., § 158(b)(4)(i)); or to engage in speech that “threaten[s], coerce[s], or restraints] any person” with the object of forcing someone to join a union or forcing someone to cease doing business with another person (id., § 158(b)(4)(ii)(A), (B)). The NLRA also prohibits picketing whose object is to force ah employer to recognize a union or to force employees to join a union. (29 U.S.C. § 158(b)(7).) It further prohibits secondary picketing (NLRB v. Retail Store Employees (1980) 447 U.S. 607 [65 L.Ed.2d 377, 100 S.Ct. 2372]) and secondary boycotts (Longshoremen v. Allied International, Inc. (1982) 456 U.S. 212 [72 L.Ed.2d 21, 102 S.Ct. 1656])—prohibitions the high court has upheld on the ground that “[secondary boycotts and picketing by labor unions may be prohibited, as part of ‘Congress’ striking of the delicate balance between union freedom of expression and the ability of neutral employers, employees, and consumers to remain free from coerced participation in industrial strife.’ ” (NAACP v. Claiborne Hardware Co. (1982) 458 U.S. 886, 912 [73 L.Ed.2d 1215, 102 S.Ct. 3409], quoting NLRB v. Retail Store Employees, at pp. 617-618 (cone. opn. of Blackmun, J.).)
Although these laws arguably favor or disfavor certain kinds of speech on the basis of content, they have never been held to violate the federal Constitution. (See Longshoremen v. Allied International, Inc., supra, 456 U.S. at p. 226 [“We have consistently rejected the claim that secondary picketing by labor unions in violation of § 8(b)(4) [of the NLRA] is protected activity under the First Amendment.”]; Hudgens v. NLRB (1976) 424 U.S. 507, 521 [47 L.Ed.2d 196, 96 S.Ct. 1029] [holding that the “constitutional guarantee of free expression has no part to play in a case such as this” and remanding to the National Labor Relations Board to determine in the first instance the proper accommodation between labor rights and private property rights]; NLRB v. Gissel Packing Co. (1969) 395 U.S. 575, 616-620 [23 L.Ed.2d 547, 89 S.Ct. 1918] [holding that interests in fair and peaceful labor relations justify limited restrictions on employers’ speech in the context of labor disputes]; Senn v. Tile Layers Union (1937) 301 U.S. 468, 472 [81 L.Ed. 1229, 57 S.Ct. 857] [holding that Wisconsin Labor Code provisions authorizing peaceful picketing and publicizing of labor disputes did not violate the due process clause or the equal protection clause of the Fourteenth Amendment].)
Beyond the context of labor-management relations, many federal and state employment laws contain content-based speech protections—for example, whistleblower protections and antiretaliation provisions in civil rights laws. (See, e.g., 29 U.S.C. § 660(c) [making it unlawful to retaliate against an employee who reports a violation of the federal Occupational Safety and Health Act]; 18 U.S.C. § 1514A(a) [protecting employees who report fraud or violations of securities law under the provisions of Sarbanes-Oxley Act of *1117 2002]; 42 U.S.C. § 2000e-3(a) [protecting speech that reports or opposes status-based discrimination, harassment, or retaliation]; Lab. Code § 1102.5 [protecting disclosure of violation of state or federal law].) Federal and state employment laws also contain content-based prohibitions on speech—for example, laws against racial, sexual, or other status-based harassment. (See, e.g., 42 U.S.C. § 2000e-2 [prohibiting status-based harassment]; Aguilar v. Avis Rent A Car System, Inc. (1999) 21 Cal.4th 121, 130 [87 Cal.Rptr.2d 132, 980 P.2d 846] [holding that the Cal. Fair Employment and Housing Act (Gov. Code, § 12900 et seq.) prohibits the use of racist epithets in the workplace and does not constitute an improper prior restraint on freedom of expression].) In California, some laws compel speech based on content, including a provision of the California Fair Employment and Housing Act that requires all employers with more than 50 employees to conduct trainings on prohibited discrimination. (Gov. Code, § 12950.1; Cal. Code Regs., tit. 22, § 7288.0, subd. (b).) Again, these laws have never been struck down on First or Fourteenth Amendment grounds. (See, e.g., Harris v. Forklift Systems, Inc. (1993) 510 U.S. 17 [126 L.Ed.2d 295, 114 S.Ct. 367] [upholding imposition liability under title VII of the Civil Rights Act of 1964 for a broad category of sexually harassing speech that creates a hostile work environment].)
Although there may be no single theory that can account for all of the First Amendment jurisprudence discussed above, much of it can perhaps be explained by a distinction between the economic conduct at issue and the expressive content of that conduct. This distinction is easy to discern in, say, a law against price fixing. Such a law prohibits certain kinds of speech based on content, but it does so because it is really targeting a certain kind of economic conduct. Similarly, the Moscone Act protects certain kinds of speech (“Join our union!” or “Non-union store: don’t shop here!”). But it does so because it aims to promote a certain kind of economic conduct— labor dispute resolution through collective bargaining—that the Legislature believes conducive to its public policy goals for the workplace and the economy. (See Code Civ. Proc., § 527.3, subd. (a) [Moscone Act aims “to promote the rights of workers to engage in concerted activities for the purpose of collective bargaining, picketing or other mutual aid or protection, and to prevent the evils which frequently occur when courts interfere with the normal processes of dispute resolution between employers and recognized employee organizations”].) Viewed this way, the Moscone Act and section 1138.1 are not speech regulations but economic regulations that govern the relationship between labor and management. Like a price-fixing statute, they fall outside the scope of First Amendment concern. (Cf. R. A. V. v. St. Paul (1992) 505 U.S. 377, 389 [120 L.Ed.2d 305, 112 S.Ct. 2538] [“[S]ince words can in some circumstances violate laws directed not against speech but against conduct (a law against treason, for example, is violated by telling the enemy the Nation’s defense secrets), a particular content-based subcategory *1118 of a prescribable class of speech can be swept up incidentally within the reach of a statute directed at conduct rather than speech.”].)
In sum, a vast array of federal and state employment and labor laws, many of which protect, prohibit, or even compel speech based on its content, has never been held to violate the federal Constitution. The comprehensive regulatory regimes that govern employer-employee relations reflect careful balancing of the interests of labor and management within the context of a legislature’s broad economic goals. The Moscone Act and section 1138.1 are part of such a regime, and neither statute violates the First Amendment prohibition on content-based speech regulation.
II.
As to the scope of substantive rights set forth in the Moscone Act, I offer a few comments in response to the separate opinions of the Chief Justice and Justice Chin.
Justice Chin points out that the NLRA does not compel an employer to allow nonemployee labor organizers onto its business premises unless its employees áre otherwise inaccessible. (Cone. & dis. opn. of Chin, J., post, at p. 1123, citing Lechmere, Inc. v. NLRB (1992) 502 U.S. 527, 534 [117 L.Ed.2d 79, 112 S.Ct. 841].) This is true, but not particularly relevant to the scope of the Moscone Act. As we explained in Sears, nothing in federal law “confers on the employer an affirmative right to exclude union pickets unless such picketing constitutes an unfair labor practice.” (Sears, supra, 25 Cal.3d at p. 332; see Thunder Basin Coal Co. v. Reich (1994) 510 U.S. 200, 217, fn. 21 [127 L.Ed.2d 29, 114 S.Ct. 771] [“The right of employers to exclude union organizers from their private property emanates from state common law, and while this right is not superseded by the NLRA, nothing in the NLRA expressly protects it.”]; N.L.R.B. v. Calkins (9th Cir. 1999) 187 F.3d 1080, 1094-1095 [“State trespass law that does not guarantee the right to exclude causes no conflict [with federal law], in that it does not prohibit federally protected conduct; instead, such law grants broader accommodation of protected conduct than is required by the federal labor law.”].) Accordingly, our state law may, and does, grant labor organizers broader rights without conflicting with federal law.
In her concurring opinion, the Chief Justice aims to provide guidance to lower courts and the parties in construing the rights secured by the Moscone Act. She quotes Pezold v. Amalgamated etc. Workmen (1942) 54 Cal.App.2d 120, 123 [128 P.2d 611], for the proposition that “ ‘picketing, wherein the persuasion brought to bear contains a threat of physical violence, is unlawful, and . . . the use of words and an aggregation of pickets which reasonably *1119 induce fear of physical molestation may properly be enjoined.’ ” (Cone. opn. of Cantil-Sakauye, C. J., ante, at p. 1105.) This proposition is undoubtedly correct, since acts of physical violence and intimidation are unlawful under the Moscone Act. (See Code Civ. Proc., § 527.3, subd. (e) [“It is not the intent of this section to permit conduct that is unlawful including breach of the peace, disorderly conduct, the unlawful blocking of access or egress to premises where a labor dispute exists, or other similar unlawful activity.”].)
However, the remainder of the Chief Justice’s analysis gives me pause. The Chief Justice proposes the principle that “labor activity with an objective other than communicating labor’s grievances and persuading listeners exceeds the right to engage in peaceful picketing . . .” under the Moscone Act. (Cone. opn. of Cantil-Sakauye, C. J., ante, at p. 1105.) Although this principle may be sensible in the abstract, I worry it will be difficult to apply in practice. The Chief Justice suggests, for example, that “patrolling a small area with more signs than reasonably required to publicize the dispute” is not protected. (Id. at p. 1106.) But if reasonableness is the test, then we must ask reasonable to whom? Business owners are likely to argue that any labor activity that drives customers away is unreasonable. Yet the fact that labor activity may dissuade customers from shopping at a store cannot alone be grounds for concluding that the activity unlawfully interferes with the operation of the business. After all, that is often the whole point of the labor activity authorized by the Moscone Act. And if customers are in fact driven away, how is a court to determine whether they were driven away out of sympathy with the protestors’ cause, out of disgust with the protestors’ cause, or out of a desire simply not to be hassled regardless of the protestors’ cause? Whether labor protestors have used “more signs than reasonably required to publicize the dispute” would seem to turn on such difficult inquiries.
The Chief Justice also suggests that signs larger than a certain size may be prohibited. (Cone. opn. of Cantil-Sakauye, C. J., ante, at pp. 1106, 1107.) But it is not clear how courts would determine what sign size would be permissible in various contexts. While it may be true that large signs (what is large?) are not strictly necessary to convey the basic message of a labor protest, it is also true that larger signs are likely more effective in conveying that message. At what point does a court say that the communicative value of a marginally more effective form of protest is outweighed by the incremental potential for interference with the business? Answering this question becomes particularly difficult when a case involves nontraditional forms of protest designed to have an emotional impact on the intended audience. For example, unions have protested what they consider to be unfair labor practices by staging mock funerals or inflating giant rat balloons near the entrance of the target establishment. (See Comment, On Mock Funerals, Banners, and Giant Rat Balloons: Why Current Interpretation of Section 8(b)(4)(ii)(B) of the National Labor Relations Act Unconstitutionally Burdens Union Speech *1120 (2007) 56 Am. U. L.Rev. 1621, 1623.) Again, while such tactics may not be necessary to convey protestors’ basic message, they are likely more effective at capturing patrons’ attention and creating a lasting impression.
Of course, we can assign to ourselves and the lower courts the task of making case-by-case judgments as to what is “reasonable.” The task would involve balancing labor’s communication interests against management’s economic interests in each case. But such balancing, done under the auspices of construing a statute, seems to contemplate a rather substantial degree of ad hoc judicial policymaking. Moreover, the balancing inquiry will, I fear, serve as a standing invitation for litigants to draw courts into the business of resolving labor disputes—which is precisely what the Legislature sought to prevent by passing the Moscone Act. (See ante, at pp. 1111-1112.)
In determining what is lawful protest activity under the Moscone Act, I believe courts should hew closely to the text of the Moscone Act itself. The statute provides that the following activities “shall be legal”: (1) “[gjiving publicity to” the existence of a labor dispute by “any . . . method not involving fraud, violence or breach of the peace”; (2) “[pjeaceful picketing or patrolling involving any labor dispute”;, and (3) “[ajssembling peaceably” to do the activities outlined in paragraphs (1) and (2). (Code Civ. Proc., § 527.3, subd. (b).) The statutory text contains several built-in limitations on legal protest activities: The activities must be peaceful. They must not involve fraud, violence, or breach of the peace. And, as subdivision (e) provides, “[i]t is not the intent of this section to permit conduct that is unlawful including breach of the peace, disorderly conduct, the unlawful blocking of access or egress to premises where a labor dispute exists, or other similar unlawful activity.” (Id., subd. (e).) Thus, the text of the Moscone Act itself defines what activities unlawfully interfere with the conduct of the business and proscribes such activities. Courts should tightly tether the “lawfulness” inquiry to the statutory text in order to avoid the hazards of judicial policymaking and excessive involvement in labor disputes.
Finally, the Chief Justice notes that a business “owner will be familiar with its own promotional activities and will be aware of the impact that labor’s signs, by virtue of their size, height, or location, will have on those activities.” (Cone. opn. of Cantil-Sakauye, C. J., ante, at p. 1107.) Because of that familiarity, the Chief Justice says, business owners “may certainly articulate, before any labor action or on an ad hoc basis, rules and policies aimed at curbing labor conduct that exceeds the rights recognized by the Moscone Act. Labor must abide by the owner’s rules and policies to the extent required to prevent unlawful interference with the business, despite the fact that the limits imposed by the owner may reduce labor’s ability to communicate its message.” (Ibid.)
*1121 I am not sure what to make of this passage. A business can certainly adopt whatever restrictions it deems best for its own interests. But I do not see how “rules and policies” adopted by a business owner carry any weight in resolving what activities are “lawful” under the Moscone Act, beyond the weight of the evidence introduced by the business owner to demonstrate an unlawful interference with the business. Any suggestion that courts should defer to restrictions imposed by a business owner or treat such restrictions as a starting point for assessing what is lawful finds no support in the Moscone Act. The statute does not mention such restrictions or remotely hint that labor picketers must adhere to such restrictions. Although a business owner is entitled to introduce evidence that a labor protest is obstructing patrons’ access or egress to the store or is otherwise fraudulent, violent, or disorderly, the fact that a business has codified its desired restrictions into a set of “rules and policies” has no independent bearing on the legal analysis.
In sum, the text of the Moscone Act provides store owners with important protections from unreasonable interference with their business operations. Judicial restraint—the very principle that the Legislature sought to enforce by passing the Moscone Act (see ante, at pp. 1111-1112)—counsels that courts, in determining what is lawful protest activity, should avoid ad hoc balancing and should instead evaluate the conduct at issue against the terms of the statute itself.
Werdegar, J., concurred.